UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-------------------------------------------------------------------------- x

RUTH SCHWARTZ, ARI SCHWARTZ, RUTH : 
SCHWARTZ AND ARI SCHWARTZ FOR THE ESTATE :
OF EZRA SCHWARTZ, MOLLIE SCHWARTZ, H.S., a :   **Case No. 18-cv-1349**
minor, E.S, a minor, A.S., a minor, MICHAEL :
BENZAKEIN, BETTY BENZAKEIN, RALPH :
BENZAKEIN, JACQUES BENZAKEIN, S.B., a minor, :
L.B., a minor, JASON GELLER, SANDRA GELLER, :   **COMPLAINT**
MARC GELLER and JACQUELINE GELLER, :
                                              :
                        Plaintiffs, :
                                              :
 -against- :
                                              :
ISLAMIC REPUBLIC OF IRAN :
Ministry of Foreign Affairs :
Khomeini Avenue :
United Nations Street :
Tehran, Iran, :
                                              :
                        Defendant. :
                                              :
-------------------------------------------------------------------------- x

   Plaintiffs Ruth Schwartz, Ari Schwartz, Ruth Schwartz and Ari Schwartz for the Estate of

Ezra Schwartz, Mollie Schwartz, H.S., a minor, E.S., a minor, A.S., a minor, Michael Benzakein,

Betty Benzakein, Ralph Benzakein, Jacques Benzakein, S.B., a minor, L.B., a minor, Jason Geller,

Sandra Geller, Marc Geller, and Jacqueline Geller, by their attorneys, allege the following:

## NATURE OF THE ACTION

   1.  This is a civil action pursuant to the provisions of the Foreign Sovereign Immunities

Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), including the terrorism exception to sovereign immunity,

28 U.S.C. § 1605A, against the Islamic Republic of Iran ("Iran"), a designated State Sponsor of

Terrorism.

   2.  Defendant knowingly provided material support to the U.S.-designated Foreign

Terrorist Organization ("FTO")[1] Islamic Resistance Movement ("HAMAS"), which perpetrated the November 19, 2015 terrorist attack at Gush Etzion Junction in the Palestinian Territories (the "Attack") in which Ezra Schwartz was killed and Michael Benzakein and Jason Geller were injured.

3.      The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. This designation has remained in effect since that time.

4.      The United States designated HAMAS an FTO in 1997. This designation has remained in effect since that time.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, and 1605A(a)(1).

6.      Twenty-eight U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, including its officials, employees or agents while acting within the scope of their office, employment or agency, for wrongful death, personal injury, and related torts.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f).

## THE PARTIES

**A.      The Plaintiffs**

8.      Ezra Schwartz was a citizen of the United States when he was killed in the Attack.

9.      Plaintiff Ruth Schwartz is a citizen of the United States and a resident of the State of Massachusetts. She is the mother of Ezra Schwartz.

---

[1]      As that term is defined in 8 U.S.C. § 1189.

10.     Plaintiff Ari Schwartz is a citizen of the United States and a resident of the State of Massachusetts. He is the father of Ezra Schwartz.

11.     Plaintiff Mollie Schwartz is a citizen of the United States and a resident of the State of Massachusetts. She is the sister of Ezra Schwartz.

12.     Plaintiff H.S., a minor represented by his legal guardians Ruth Schwartz and Ari Schwartz, is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

13.     Plaintiff E.S., a minor represented by his legal guardians Ruth Schwartz and Ari Schwartz, is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

14.     Plaintiff A.S., a minor represented by his legal guardians Ruth Schwartz and Ari Schwartz, is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Ezra Schwartz.

15.     Plaintiffs Ruth Schwartz and Ari Schwartz bring an action on behalf of the Estate of Ezra Schwartz, as its legal representatives.

16.     Plaintiff Michael Benzakein is a citizen of the United States and a resident of the State of New York.

17.     Plaintiff Betty Benzakein is a citizen of the United States and a resident of the State of New York. She is the mother of Michael Benzakein.

18.     Plaintiff Ralph Benzakein is a citizen of the United States and a resident of the State of New York. He is the father of Michael Benzakein.

19.     Plaintiff Jacques Benzakein is a citizen of the United States and a resident of the State of New York. He is the brother of Michael Benzakein.

20.     Plaintiff S.B., a minor represented by her legal guardians Betty Benzakein and Ralph Benzakein, is a citizen of the United States and a resident of the State of New York. She is the sister of Michael Benzakein.

21.     Plaintiff L.B., a minor represented by her legal guardians Betty Benzakein and Ralph Benzakein, is a citizen of the United States and a resident of the State of New York. She is the sister of Michael Benzakein.

22.     Plaintiff Jason Geller is a citizen of the United States and a resident of the State of New York.

23.     Plaintiff Sandra Geller is a citizen of the United States and a resident of the State of New York. She is the mother of Jason Geller.

24.     Plaintiff Marc Geller is a citizen of the United States and a resident of the State of New York. He is the father of Jason Geller.

25.     Plaintiff Jacqueline Geller is a citizen of the United States and a resident of the State of New York. She is the sister of Jason Geller.

26.     Each Plaintiff was a United States citizen at all relevant times, including at the time of the Attack alleged herein.

**B.      The Defendant**

27.     At all times relevant to this Complaint, Defendant Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and a designated State Sponsor of Terrorism. Iran knowingly provided material support and resources for, and performed actions that caused, acts of extrajudicial killing and attempted extrajudicial killing within the meaning of 28 U.S.C. § 1605A, including the Attack that caused Plaintiffs' injuries.

28.     The Government of Iran is politically and ideologically hostile to the United States and its allies and has consistently sponsored acts of international terrorism against the United

States and its allies and their citizens, particularly through one of its main Palestinian terrorist proxies, HAMAS.

29.     Iran's support for terrorism is a key part of its attempts to spread the principles underlying its 1979 Islamic revolution throughout the region. Iran's paramilitary force, the Islamic Revolutionary Guard Corps ("IRGC"), is tasked with defending and exporting Iran's Islamic revolution. This includes providing funding, training, weapons, and other support on Iran's behalf for terrorist groups throughout the Middle East, including HAMAS.

30.     The IRGC supports terrorist groups primarily through its "Qods Force" division, ("IRGC-QF"), which was designated a Specially Designated Global Terrorist ("SDGT") by the United States pursuant to Executive Order 13,224 on October 25, 2007.

31.     On August 2, 2017, the Countering America's Adversaries Through Sanctions Act ("CAATSA") expressly extended findings relating to the IRGC-QF to the IRGC as a whole: "The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of destabilizing activities," including "support for acts of international terrorism." Pub. L. 115-44, § 105(a)(3) (2017).

32.     The U.S. Department of the Treasury designated the IRGC an SDGT under Executive Order 13,224 on October 13, 2017 for providing support for Iranian terrorism, including to HAMAS.

33.     In designating the IRGC an SDGT, Treasury Secretary Steven T. Mnuchin said, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror," and participated in the IRGC-QF's "support for a number of terrorist groups, including . . . Hamas."

34.     The U.S. State Department's annual report "Patterns of Global Terrorism" (later,

"Country Reports on Terrorism") states that Iran has supported HAMAS – including providing "weapons, training, and funding" – from nearly HAMAS's inception to the present day.

35.     Iran "ordered" terrorist attacks on Israelis and others in Israel, and paid HAMAS members for committing attacks.

36.     Iran's support grew exponentially after HAMAS won the 2006 Palestinian legislative election, and even more so after HAMAS ousted its rival Palestinian party, Fatah, from the Gaza Strip. HAMAS leadership, based in Syria, repeatedly visited Tehran, and HAMAS operatives trained in IRGC camps in Iran.

## FACTUAL ALLEGATIONS

### A.     The Attack

37.     On November 19, 2015, Ezra Schwartz and Plaintiffs Michael Benzakein and Jason Geller were riding in a passenger van on their way to deliver care packages to Israeli soldiers and to beautify a park in honor of three Israeli boys who had been kidnapped and murdered in 2014. Ezra, Michael, and Jason were in Israel studying for the year before they started college in the United States.

38.     The van they were traveling in passed through Gush Etzion Junction, where it encountered traffic and was forced to slow down.

39.     Muhammad Abd al-Basset Odeh al-Harub, a member of HAMAS, was driving a car looking for a place to commit a terror attack near Gush Etzion Junction, which is located near a large Jewish community. Al-Harub wanted to kill as many Jews as he could.

40.     When al-Harub reached Gush Etzion Junction, however, he saw only a few Jews, so he headed west toward the Jewish communities of the Gush Etzion region.

41.     Finding no suitable target there, al-Harub turned back toward Gush Etzion Junction.

42.     When he arrived at Gush Etzion Junction, there was traffic; as a result, vehicles in

the area were moving slowly. Al-Harub seized the opportunity and opened fire with an Uzi automatic submachine gun, spraying the surrounding vehicles and their passengers with bullets.

43.     Al-Harub emptied three magazines, constituting 75 bullets, and used his car to ram other vehicles before being apprehended.

44.     By the time the Attack was over, three people, including Ezra Schwartz, had been killed, and nine others, including Plaintiffs Michael Benzakein and Jason Geller, had been injured.

### The Schwartz Family

45.     Ezra was struck by bullets and died at the scene of the Attack.

46.     The school where Ezra had been studying in Israel called his father, Plaintiff Ari Schwartz, and told him that Ezra had been shot.

47.     Ari did not know immediately that Ezra had died. He called his wife and Ezra's mother, Plaintiff Ruth Schwartz, and told her what he knew.

48.     Later that day, Ari and Ruth learned that Ezra had been killed in the Attack.

49.     Ezra's body was sent home to the United States, and the Schwartz family buried him there.

50.     Ezra's two sisters, Plaintiffs Ruth and Mollie Schwartz, sought psychological counseling to deal with the mental anguish they suffered as a result of Ezra's murder.

51.     Ezra's three brothers, Plaintiffs H.S., E.S., and A.S., saw social workers and attended a bereavement group to deal with the mental anguish they suffered as a result of Ezra's murder.

52.     As a direct and foreseeable result of the Attack, Plaintiffs Ruth Schwartz, Ari Schwartz, Mollie Schwartz, H.S., E.S. and A.S. have experienced severe mental anguish, extreme emotional distress, bereavement and grief and the loss of their son's/brother's society, companionship, comfort, protection, attention, advice and counsel.

### The Benzakein Family

53.    Michael was hit by flying glass which lodged in his knee.

54.    He was taken to Shaare Tzedek Hospital, where he was examined, glass was removed from his knee, and his wounds were treated.

55.    On the day of the Attack, the Benzakein family had received a group text from Michael that said, "I love you."

56.    Finding that message odd, Michael's father, Plaintiff Ralph Benzakein, unsuccessfully attempted many times to contact Michael.

57.    After finally doing so, Ralph was informed by Michael that he had been shot and that he thought his friend Ezra had been killed. Then the phone went dead.

58.    Only later that day did Ralph and his wife, Plaintiff Betty Benzakein, learn further information about the Attack.

59.    As a result of the Attack, Michael saw a trauma specialist – a psychologist – on four occasions.

60.    Michael was unable to attend the engineering program that he had been accepted to because his emotional injuries caused by the Attack made it too difficult for him to concentrate. He enrolled instead in an associate degree program at a community college.

61.    As a direct and foreseeable result of the Attack, Plaintiff Michael Benzakein sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

62.    As a direct and foreseeable result of the Attack that injured Michael Benzakein, Plaintiffs Betty Benzakein, Ralph Benzakein, Jacques Benzakein, S.B. and L.B. have experienced severe mental anguish and extreme emotional distress.

### The Geller Family

63.    Jason Geller was hit by flying glass which lodged in his neck and knee.

64.     He tried to attend to Ezra after Ezra was shot.

65.     Jason called his father, Plaintiff Marc Geller, and told him that he had been injured in the Attack.

66.     Jason was taken to Shaare Tzedek Hospital where he was examined, glass was removed from his neck and knee, and his wounds were treated.

67.     He also spoke with his mother, Plaintiff Sandra Geller, and informed her what had happened.

68.     Jason experienced emotional distress and saw a trauma specialist – a psychologist – weekly for one month and subsequently once every six months.

69.     As a direct and foreseeable result of the Attack, Plaintiff Jason Geller sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

70.     As a direct and foreseeable result of the Attack that injured Jason Geller, Plaintiffs Sandra Geller, Marc Geller and Jacqueline Geller have experienced severe mental anguish and extreme emotional distress.

**B.     The Islamic Resistance Movement ("HAMAS")**

71.     Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS.

72.     HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" – in English, the Islamic Resistance Movement – which was founded in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin.

73.     It is an offshoot of the Muslim Brotherhood, a radical Islamic group founded by Hassan al-Banna in Egypt in 1928.

74.     HAMAS is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

75.     It is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism. The HAMAS Charter states that HAMAS's very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

76.     HAMAS is nominally divided into three interconnected wings: the political wing, the "Da'wa" (HAMAS's putative social service or humanitarian component), and the military operational wing known as the Izz-al-Din al-Qassam Brigades. Although these components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

77.      HAMAS's social services are, in large part, administered by local "zakat" committees and charitable societies that collect and distribute funds on HAMAS's behalf. These committees and societies were either established by HAMAS or taken over by HAMAS via, *inter alia*, HAMAS members, operatives and activists serving as members of their governing boards.

78.     Consistent with the findings of both the United States Congress and Executive Branch, financial services and other material support provided to any part of HAMAS ultimately inures to the benefit of its criminal, terrorist functions – regardless of whether such support was ostensibly provided to support non-violent activities. HAMAS uses its charitable and social infrastructure to, among other things, recruit and train Izz al-Din al-Qassam Brigades cell members and provide salaries for HAMAS's terrorist operatives and leadership.

79.     HAMAS also uses violence, principally suicide bombings, shootings and rocket attacks, and threats of violence to pressure Israel to cede territory to the Palestinian people.

80.     HAMAS also uses money, including money it receives from Iran, to pay the families of captured or killed terrorists in order to incentivize Palestinians to commit terrorist acts.

81.     On January 25, 1995, HAMAS was designated a Specially Designated Terrorist ("SDT"). On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS an FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). HAMAS has continuously remained designated an FTO since 1997 and appears on the current list published by the U.S. State Department's Office of the Coordinator for Counterterrorism.[2] On October 31, 2001, pursuant to Executive Order 13,224, HAMAS was designated an SDGT.

82.     HAMAS began committing terrorist attacks in 1989, including suicide bombings and shootings. Since September 2000, when a violent uprising erupted against Israel (commonly known as the "Second Intifada" or "al-Aqsa Intifada"), HAMAS has launched hundreds of terrorist attacks targeting civilians that have killed and injured hundreds of people including over 20 mass murders that have killed more than 370 civilians, including numerous American citizens.

C.     **HAMAS's Responsibility for the Attack**

83.     On November 20, 2015, the day after the Attack, HAMAS publicized its appreciation for al-Harub in a poster,[3] describing his action as heroic.

84.     On February 24, 2016, in a press release on HAMAS's website, senior HAMAS official Abd al-Rahman Shadid called on "the people in the Hebron area to support the famil[y] of the prisoner[] Muhammad Abd al-Basset al-Harub . . . , whose home[] the occupation forces destroyed the day before."[4]

---

[2]     *See* https://www.state.gov/j/ct/rls/other/des/123085.htm.

[3]     *See* https://twitter.com/paldf/status/667967030402883584.

[4]     *See* http://hamas.ps/ar/post/4969.

85.     Shadid indicated that "the hero[] al-Harub [is an] excellent symbol[] of Hamas movement's operatives, who pay the precious price for the liberation of their land," and emphasized that "Hamas will continue to lead the way to Palestine's liberation."

86.     HAMAS posters explicitly stating that al-Harub was an operative of the Izz al-Din al-Qassam Brigades, the operational terrorist wing of HAMAS (the posters referred to al-Harub as "the Qassami prisoner"), were displayed at al-Harub's home on February 23, 2016. The posters made clear publicly and openly that the perpetrator of the Attack, al-Harub, was an operative of HAMAS's military operational wing.

### D.     Iran's Material Support for HAMAS

87.     Since shortly after HAMAS's founding in 1987, Iran has provided significant material support and resources to it, including military training, weaponry, bases for training and storing weapons and explosives, safe havens, communications equipment, financial support and services, and transportation. *See* U.S. Dep't of State, Country Reports on Terrorism 2015 ("Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups . . . . These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank.").[5]

88.     Iran provided this support to HAMAS pursuant to an agreement they reached in the 1980s which remains in force today. Under that agreement, HAMAS undertook to carry out acts of extrajudicial killing, hostage taking and terrorism against Jews in Israel and the Palestinian Territories (the West Bank and Gaza), and in return Iran undertook to provide HAMAS with financial and other support to carry out such unlawful acts.

---

[5]      Available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm.

89.     Iran's financial support to HAMAS is predicated on the quantity and effectiveness of HAMAS's terrorist attacks. The bulk of the funds Iran transfers to HAMAS are used to bolster HAMAS's terrorist actions and suicide missions.

90.     Iran has also armed HAMAS. Ships loaded with Iranian munitions have been seized en route to Gaza. The U.S. Navy has also hunted Iranian ships in the region carrying weapons bound for HAMAS.

91.     Iran gave substantial aid, assistance and encouragement to HAMAS, and provided massive financial and other forms of material support to HAMAS, and thereby aided and abetted HAMAS, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, hostage taking and international terrorism. Iran did so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of Iran's aiding, abetting and provision of material support and resources to HAMAS.

92.     Iran knowingly and willingly conspired, agreed and acted in concert with HAMAS, pursuant to the common plan, design, agreement and goals set out herein, to cause and facilitate the commission of acts of extrajudicial killing, hostage taking and international terrorism. Iran did so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of Iran's conspiracy with HAMAS.

93.     This Court has repeatedly held that Iran is liable to victims of state-sponsored terrorism, including for terrorist acts committed by HAMAS. *See*, *e.g.*, *Bennett, et al. v. Islamic Republic of Iran, et al.*, 507 F. Supp. 2d 117 (D.D.C. 2007); *Bodoff, et al. v. Islamic Republic of Iran, et al.*, 424 F. Supp. 2d 74 (D.D.C. 2006); *Campuzano, et al. v. Islamic Republic of Iran, et*

*al.*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Stern, et al. v. Islamic Republic of Iran, et al.*, 271 F. Supp.

2d 286 (D.D.C. 2003); *Weinstein, at al. v. Islamic Republic of Iran, et al.*, 184 F. Supp. 2d 13

(D.D.C. 2002); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017).

94.     Iran's financial support to HAMAS was provided continuously, routinely and in

furtherance and as implementation of a specific policy and practice established and maintained by

Iran, in order to help HAMAS achieve goals it shared with Iran. These goals included terrorizing

the Jewish civilian population in Israel and the Palestinian Territories and weakening Israel's

economy, social fabric, and military strength and preparedness. Iran's support for HAMAS has

continued to the present.

95.     Their relationship experienced some strain due to their opposing positions on the

Syrian civil war.[6] However, HAMAS continued to benefit from Iran's significant support. In a

November 25, 2014 speech, Iran's Supreme Leader, Ayatollah Khamenei, highlighted Iran's

military support to "Palestinian brothers" in Gaza and called for the West Bank (where Gush

Etzion is located) to be similarly armed. In December 2014, HAMAS Deputy Leader Moussa Abu

Marzouk announced bilateral relations between Iran and HAMAS were "back on track."

96.     According to the State Department's Country Reports on Terrorism 2015:

> Although Hamas's ties to Tehran have been strained due to the Syrian civil war,
> both sides took steps in 2015 to repair relations. Iran continued to declare its vocal
> support for Palestinian terrorist groups and its hostility to Israel in 2015. Supreme
> National Security Council Secretary Admiral Ali Shamkhani sought to frame a
> series of individual Palestinian attacks on Israeli security forces in the West Bank
> as a new 'Intifada' in a speech on November 25.

97.     The 2015 Report further found that "[i]n 2015, … Iran used the Islamic

Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide

---

[6]     HAMAS, a Sunni Islamist group, has supported the largely Sunni Islamist rebels, while Iran, the world's
center of Shi'a power, has supported the government's Shi'a-linked Alawite leadership.

cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorists abroad."

98. In February 2016, senior HAMAS official Osama Hamdan thanked Iran for its support of the Palestinian people.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## PERSONAL INJURY CAUSED BY IRAN'S MATERIAL SUPPORT FOR ACTS OF EXTRAJUDICIAL KILLING UNDER 28 U.S.C. § 1605A(c), CONSTITUTING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FAMILIES OF EZRA SCHWARTZ, MICHAEL BENZAKEIN, AND JASON GELLER)

99. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

100. Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism in Israel and the Palestinian Territories, such as the Attack in which Ezra Schwartz was murdered and Michael Benzakein and Jason Geller were injured.

101. Further, Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism such as the Attack, and that these acts of terrorism would cause severe emotional distress to any and all persons within close proximity of those attacks or those whose immediate family members experienced the attacks.

102. Iran's conduct was unreasonable and outrageous and exceeded the bounds usually tolerated by decent society, and was performed willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiffs severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life.

103.    As detailed above, Ezra Schwartz was murdered and Michael Benzakein and Jason Geller were injured when Muhammad Abd al-Basset Odeh al-Harub, a HAMAS terrorist, opened fire with an Uzi automatic submachine gun at the passenger van Ezra, Michael, and Jason were traveling in.

104.    Plaintiffs Ruth Schwartz, Ari Schwartz, Mollie Schwartz, H.S., E.S., and A.S. suffered the trauma of learning that their son and brother, Ezra Schwartz, was killed in a terrorist attack.

105.    Plaintiffs Betty Benzakein, Ralph Benzakein, Jacques Benzakein, S.B., and L.B. suffered the trauma of learning that their son and brother, Michael Benzakein, was injured in a terrorist attack.

106.    Plaintiffs Sandra Geller, Marc Geller, and Jacqueline Geller suffered the trauma of learning that their son and brother, Jason Geller, was injured in a terrorist attack.

107.    As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel and the Palestinian Territories, Plaintiffs Ruth Schwartz, Ari Schwartz, Mollie Schwartz, H.S., E.S., A.S., Betty Benzakein, Ralph Benzakein, Jacques Benzakein, S.B., L.B., Sandra Geller, Marc Geller, and Jacqueline Geller have each suffered non-pecuniary damages, including solatium, emotional pain and suffering, and mental anguish in amounts to be proven at trial.

108.    Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF

## PERSONAL INJURY AND DEATH CAUSED BY MATERIAL SUPPORT FOR ACTS OF EXTRAJUDICIAL KILLING UNDER 28 U.S.C. § 1605A(c), CONSTITUTING ASSAULT, BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND WRONGFUL DEATH (ESTATE OF EZRA SCHWARTZ)

109.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

110.    Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism in Israel and the Palestinian Territories, such as the Attack in which Ezra Schwartz was murdered, and that such attacks would cause the death, physical injury, and emotional injury of victims like Ezra.

111.    As detailed above, Ezra was murdered when al-Harub, a HAMAS terrorist, opened fire with an Uzi submachine gun at the passenger van Ezra was traveling in.

112.    Ezra was pronounced dead several minutes after he was shot by al-Harub.

113.    As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel and the Palestinian Territories, Ezra Schwartz was murdered and his Estate suffered non-pecuniary and economic damages, including wrongful death, lost wages and benefits, physical and emotional pain and suffering, and mental anguish in amounts to be proven at trial.

114.    Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

### THIRD CLAIM FOR RELIEF

### PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c), CONSTITUTING ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MICHAEL BENZAKEIN)

115.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

116.    Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism in Israel and the Palestinian Territories, such as the Attack in which Plaintiff Michael Benzakein was injured, and that such attacks would cause harmful or offensive contact to HAMAS's victims and imminent apprehension of same.

117.    As detailed above, Michael was injured when al-Harub opened fire with an Uzi submachine gun at the passenger van Michael was traveling in.

118.    Michael was put in imminent apprehension of being injured or killed by bullets or shrapnel.

119.    Michael was also struck by flying glass, which stuck in his knee.

120.    Further, Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism such as the Attack, and that these acts of terrorism would cause severe emotional distress to any and all persons within close proximity of those attacks or those whose immediate family members experienced the attacks.

121.    Iran's conduct was unreasonable and outrageous and exceeded the bounds usually tolerated by decent society, and was performed willfully, maliciously and deliberately, or with reckless indifference, to cause victims like Michael Benzakein severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life.

122.    Michael Benzakein suffered the trauma of experiencing and surviving a terrorist attack, fearing for his life, witnessing the injury and death of others, and suffering physical injuries.

123.    Michael Benzakein's emotional distress also, *inter alia*, prevented him from matriculating at the engineering program to which he was accepted, instead attending community college in pursuit of an associate degree.

124.    As a result, Michael Benzakein lost employment opportunities, including concomitant wages and benefits.

125.    As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel and the Palestinian Territories, Plaintiff Michael Benzakein suffered non-pecuniary damages, including physical and emotional pain and suffering and mental anguish, and economic damages in amounts to be proven at trial.

126.    Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

### FOURTH CLAIM FOR RELIEF

### PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c), CONSTITUTING ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (JASON GELLER)

127.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

128.    Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism in Israel and the Palestinian Territories, such as the Attack in which Plaintiff Jason Geller was injured, and that such attacks would cause harmful or offensive contact to HAMAS's victims and imminent apprehension of same.

129.    As detailed above, Jason was injured when al-Harub opened fire with an Uzi submachine gun at the passenger van Jason was traveling in.

130.    Jason was put in imminent apprehension of being injured or killed by bullets or shrapnel.

131.    Jason was struck by flying glass, which stuck in his neck and knee.

132.    Further, Iran provided material support to HAMAS, intending or recklessly disregarding that HAMAS would commit violent acts of terrorism such as the Attack, and that these acts of terrorism would cause severe emotional distress to any and all persons within close proximity of those attacks or those whose immediate family members experienced the attacks.

133.    Iran's conduct was unreasonable and outrageous and exceeded the bounds usually tolerated by decent society, and was performed willfully, maliciously and deliberately, or with reckless indifference, to cause victims like Jason Geller severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life.

134.    Jason Geller suffered the trauma of experiencing and surviving a terrorist attack, fearing for his life, witnessing the injury and death of others, and attempting to save the life of his friend Ezra Schwartz, and suffering physical injuries.

135.    As a direct and foreseeable result of the Attack and Iran's support of HAMAS's terror attacks in Israel and the Palestinian Territories, Plaintiff Jason Geller suffered non-pecuniary damages, including physical and emotional pain and suffering and mental anguish in amounts to be proven at trial.

136.    Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

## FIFTH CLAIM FOR RELIEF

## PREJUDGMENT INTEREST (ALL PLAINTIFFS)

137.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

138.    As described above, Iran's support for HAMAS injured Plaintiffs, warranting an award of prejudgment interest from the date of the Attack to the date of entry of judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against Defendant in favor of Plaintiffs for compensatory and punitive damages in amounts to be determined at trial;

(c)    Enter judgment against Defendant in favor of Plaintiffs for prejudgment interest in an amount to be determined by the Court;

(d)    Enter judgment against Defendant in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action; and

(e)    Grant such other and further relief as justice requires.

Dated: June 6, 2018
      Hackensack, NJ

                                **OSEN LLC**

By    /s/ Ari Ungar
              Ari Ungar (DC Bar No. NJ008)
              Aaron Schlanger (DC Bar No. NJ007)
              Michael J. Radine (DC Bar No. NJ015)
              2 University Plaza, Suite 402
              Hackensack, NJ 07601
              Tel.: (201) 265-6400
              Fax: (201) 265-0303

              Attorneys for Plaintiffs