## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SCHWARTZ, *et al.*,

    *Plaintiffs*,

  v.

THE ISLAMIC REPUBLIC OF IRAN,

    *Defendant*.

Civil Action No. 18-1349 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action for compensatory and punitive damages arises under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. The seventeen plaintiffs are the victims and their families of a terrorist attack that occurred on November 19, 2015 "at Gush Etzion Junction in the Palestinian Territories." Dkt. 1 at 1–2 (Compl. ¶ 2). Plaintiffs contend that Defendant, the Islamic Republic of Iran ("Iran"), "knowingly provided material support to" the Islamic Resistance Movement ("Hamas"), which, in turn, carried out the attack. Iran was at all relevant times designated under U.S. law as a state sponsor of terrorism.

To establish subject-matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism exception to the FSIA, 28 U.S.C. § 1605A(a). And to supply their federal cause of action, Plaintiffs rely on § 1605A(c), which permits suits by "national[s] of the United States" seeking to recover against "[a] foreign state that is or was a state sponsor of terrorism." In support of that statutory cause of action, Plaintiffs assert four theories of liability: (1) intentional infliction of emotional distress; (2) assault; (3) battery; and (4) wrongful death. Dkt. 24 at 16; Dkt. 1 at 15–20 (Compl. ¶¶ 99–136).

Iran has neither answered nor otherwise appeared in this action.  Consequently, at

Plaintiffs' request, the clerk of the Court entered a default against Iran on January 2, 2019.  Dkt.

16.  Plaintiffs subsequently moved for the entry of a default judgment against Iran.  Dkt. 22.

That motion is now ripe for the Court's consideration, and, for the reasons that follow, the

motion is **GRANTED**.  The Court will refer the matter to a Special Master for a report and

recommendation on compensatory damages and will defer entry of compensatory or punitive

damages awards pending receipt of that report.

## I.  INTRODUCTION

Plaintiffs, sixteen United States nationals and the estate of a seventeenth, bring this action

against the Islamic Republic of Iran, alleging that it "gave substantial aid, assistance and

encouragement to Hamas, and provided massive financial and other forms of material support to

Hamas, all with the specific intention of causing and facilitating the commission of acts of

extrajudicial killing, hostage taking and international terrorism," Dkt. 1 at 13 (Compl. ¶ 91),

which ultimately included the extrajudicial killing and attempted extrajudicial killings at issue

here.  Plaintiffs effected service on Defendant on October 24, 2018.  Dkt. 14 at 1.  Defendant has

not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared,

and, accordingly, the clerk of the Court entered a default on January 2, 2019.  Dkt. 16.  Plaintiffs

now seek entry of a default judgment with respect to liability and damages.  Dkt. 22.

The entry of a default judgment "is not automatic," *Mwani v. Bin Laden*, 417 F.3d 1, 6

(D.C. Cir. 2005), but instead rests with the "sound discretion" of the district court, *Boland v.

Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d

831, 836 (D.C. Cir. 1980)).  Before entering default judgment, the Court must, at a minimum,

satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over

the defendants.  *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, the Court's discretion to enter a default judgment is further circumscribed.  By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens IV*"), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

Accordingly, where, as here, a plaintiff alleges that a foreign state materially supported acts of terrorism, the Court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  In doing so, the Court must be guided by Congress's purpose in enacting § 1605A: to "compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original).  The Court must also remain mindful of the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign." *Owens IV*, 864 F.3d at 785.

To obtain a default judgment against Iran, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens IV*, 864 F.3d at 784; (2) establish that Iran was served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal, *see id.* § 1605A(c), or state law, *Owens IV*, 864 F.3d at 809 ("the pass-through approach remains viable"), by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).  When evaluating Plaintiffs' evidence, the Court must abide by the Federal Rules of Evidence, while also recognizing that, first, it has the "obligation[] to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (modifications in *Han Kim*), and, second, that it need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens IV*, 864 F.3d at 785.  Accordingly, whether through expert testimony or other competent evidence, the Court must determine whether the Plaintiffs have sufficiently "substantiate[d] [the] essential element[s] of jurisdiction," as well as their claim or right to relief, with admissible evidence.  *Id.* at 786.[1]

The Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

The record before the Court consists of the following materials: (1) the declaration of Patrick L. Clawson, "an expert on the Islamic Republic of Iran" who has "extensively studied

---

[1]  Expert testimony is often sufficient to meet this burden in "terrorism cases, . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain. *Owens IV*, 864 F.3d at 787–88.  The Court has reviewed the qualifications of Plaintiffs' expert witnesses and concludes that each is qualified to offer the opinions discussed below.  Dkt. 25 at 1–7 (Clawson Decl. ¶¶ 1–13); Dkt. 26 at 1–3 (Spitzen Decl. ¶¶ 1–6); *see also* Dkt. 27 at 1–2 (Wolf Decl. ¶ 1–2).

and researched Iran and its sponsorship of terrorism," Dkt. 25 at 1 (Clawson Decl. ¶ 2); (2) the

declaration of Colonel Arieh Dan Spitzen, an expert on Hamas and its role in terrorism

perpetrated against civilians, Dkt. 26 at 3 (Spitzen Decl. ¶ 6); (3) the declaration of Steven A.

Wolf, an expert on the calculation of economic loss in terrorism cases, Dkt. 27 at 1 (Wolf Decl.

¶ 6); and (4) the declarations of each of the Plaintiffs (or a proper representative), *see* Dkt. 28 at

1–2; *see also* Dkt. 23-1; Dkt. 23-2.[2]

Based on the foregoing, the Court finds that (1) Iran provided Hamas with extensive

support in the form of arms and financial assistance, as well as training and technical expertise;

(2) Hamas carried out the terror attack at issue here, which caused the death of Plaintiff Ezra

Schwartz, the injuries to Plaintiffs Michael Benzakein and Jason Geller, and the injuries to the

Schwartz, Benzakein, and Geller families; and (3) Hamas could not have committed the attack

without Iran's support.

## A.      Iran's Material Support to Hamas

As part of its longstanding opposition to Israeli interests in the Middle East, Iran has for

over thirty years "provided funding and training for terrorism operations that targeted United

States and Israeli citizens." Dkt. 25 at 13 (Clawson Decl. ¶ 28). As a result, the United States

designated Iran as a state sponsor of terrorism in 1984 and has continued that designation ever

since then. *Id.* at 9 (Clawson Decl. ¶ 22). One significant recipient of Iran's aid is Hamas, "the

---

[2] On October 17, 2019, Plaintiffs moved to file under seal portions of their proposed findings of fact and the declarations of two minors in the Geller family. Dkt. 23. Applying the six-factor test set forth in *United States v.  Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), the Court agrees that these materials, which include confidential, personal information—namely information related to the mental health diagnoses of one Plaintiff—may be filed under seal. The Court will, accordingly, grant Plaintiffs' motion to seal.

largest and most significant Islamist organization" in the Israel-Palestine arena. Dkt. 26 at 5 (Spitzen Decl. ¶ 13).

Hamas was "founded in the Gaza Strip in December 1987," *id.* (Spitzen Decl. ¶ 11), by a group of "Palestinian Sunni Islamist militants committed to globalizing jihad and destroying the State of Israel," Dkt. 25 at 9 (Clawson Decl. ¶ 23). The organization's name means "zeal" in Arabic and is also an acronym for "Ḥarakat al-Muqāwamah al-Islāmiyyah," which translates to the "Islamic Resistance Movement." Dkt. 26 at 5 (Spitzen Decl. ¶ 12) (italics and internal quotation marks omitted). "From its inception, Hamas [has] perpetrated terrorist attacks in Israel and the Palestinian Territories," Dkt. 25 at 9 (Clawson Decl. ¶ 24), and the organization "considers terrorism . . . a central way of attracting political and financial support from the Palestinian public and larger Islamic world," Dkt. 26 at 6 (Spitzen Decl. ¶ 16).

Since the early 1990s, Hamas has received multiple forms of aid from Iran, including: (1) weapons, including gunpowder, mortar propellant, mortar shells, and rockets, Dkt. 25 at 17, 18, 20 (Clawson Decl. ¶¶ 46, 49, 50, 52); (2) military training on intelligence gathering, "establishing camouflage, constructing sophisticated explosive charges, and operating advanced anti-tank missiles," *id.* at 17 (Clawson Decl. ¶ 45); (3) strategic advice from its Revolutionary Guard Corps Qods Force, *id.* at 16 (Clawson Decl. ¶ 43); and (4) millions to hundreds of millions of dollars in financial aid, *id.* at 14–15, 18 (Clawson Decl. ¶¶ 34, 36, 39, 47). There is near-universal agreement that Iran "has supplied substantial material support to Hamas" over the past two-and-a-half decades. *Id.* at 23 (Clawson Decl. ¶ 59).

Iran began providing financial and logistical support for Hamas in 1993 "as a result of Hamas's willingness to perpetrate terrorist activities and bus bombings"—attacks that "Iran strongly and publicly encouraged" in order "to disrupt the Middle East peace process." *Id.* at

13–14 (Clawson Decl. ¶ 31).  In the years that followed, "Hamas operatives received military training in Iran."  *Id.*  One such operative planned a 1996 bombing of a bus in Jerusalem, an act that then-Palestinian Authority Chairman Yasser Arafat claimed Iran had "ordered."  *Id.* at 14 (Clawson Decl. ¶¶ 31–32).  Iran also "gave Hamas millions of dollars" over this period, which, "among other things, supported Hamas's terrorist activities" by, for example, "bringing Hamas into contact with potential terrorist recruits and by providing legitimate front activities behind which Hamas could hide its terrorist activities."  *Id.* at 14 (Clawson Decl. ¶ 34).  Iran, moreover, undertook to pay Hamas "generously" for successful terrorist attacks; in return, Hamas "commit[ed] numerous bombings during this time," which Iran praised on "Iranian state-owned television, radio, print media and Iran's other propaganda networks throughout the Arab world."  *Id.* (Clawson Decl. ¶¶ 33–34).

Although the Iran-Hamas relationship "cooled" from the late 90s to 2005—with an uptick in 2003 when Iran provided Hamas an estimated $3 million in financial support—by 2006, after Hamas "won a plurality in the Palestinian parliament," "Iranian support, finances, and arms rose exponentially."  *Id.* at 15 (Clawson Decl. ¶¶ 35–36, 39).  According to Israel's Intelligence and Terrorism Information Center, Iran pledged "$250 million to Hamas's then-Prime Minister Ismail Haniyeh" that year and the next.  *Id.* (Clawson Decl. ¶ 39).  And "[a]lthough the Egyptian authorities are reported to have confiscated some of these funds, large sums of Iranian money flowed into the Gaza Strip earmarked for Hamas."  *Id.*

In 2007, Iran and Hamas "grew even closer after . . . Hamas took complete control of the Gaza Strip."  *Id.* (Clawson Decl. ¶ 40).  Hamas began sending operatives to Iran "for training that would last months and maybe years," while Iran continued to funnel "more money and arms" to Hamas.  *Id.* at 15–16 (Clawson Decl. ¶ 40).  Indeed, in March 2008, British

correspondent Marie Colvin reported that "150 members of . . . Hamas's military wing, the al-Qassam Brigades[,] have passed through training in Tehran, where they study for between 45 days and six months at a closed military base under the command of the elite Revolutionary Guard force." *Id.* at 16–17 (Clawson Decl. ¶ 44) (internal brackets omitted).

The provision of military training was supplemented by arms-giving: that same year, in 2008, "Israeli forensic investigators concluded" that certain mortar shells that Hamas had twice fired at Israel "had been manufactured in Iran." *Id.* at 17 (Clawson Decl. ¶ 46). Iran continued to supply Hamas arms even during a temporary Hamas-Israel ceasefire in early 2008 by smuggling weapons in tunnels from Egypt to the Gaza Strip. *Id.* (Clawson Decl. ¶ 47). Hamas was appreciative: soon after fighting between it and Israel returned in late December 2008 and early January 2009, "Hamas leader Khaled Mashal . . . visited Tehran and thanked Iran for its support during the conflict, calling it a 'partner in victory.'" *Id.* at 17–18 (Clawson Decl. ¶ 48). Iran's support remained strong through the following year when, according to Clawson, "there is strong reason to believe" that "a ship carrying 3,000 cases of powder for 120 and 130mm guns as well as over 800 cases of propellant for 125mm mortars" was bound for Gaza before authorities in Cyprus intercepted it. *Id.* at 18 (Clawson Decl. ¶ 49).

In 2012, "Iranian and Hamas officials became much blunter about Iranian support for Hamas rocket attacks on Israel." *Id.* (Clawson Decl. ¶ 50). For instance, "[o]n November 20, Ziad al-Nakhla, deputy head of PIJ [the Palestinian Islamic Jihad, *id.* at 10 (Clawson Decl. ¶ 27)], told the pro-Hezbollah Lebanese Al Manar television station" that "[t]he arms of the resistance, including those of Hamas, are Iranian, from the bullet to the missile." *Id.* at 18 (Clawson Decl. ¶ 50) (internal quotation marks omitted). A day later, Hamas leader "Khaled Mashal thanked Iran for 'arms and funding.'" *Id.* at 18–19 (Clawson Decl. ¶ 50).

In July of the following year, after the Egyptian military had overthrown "the Morsi government which had been close to Hamas, "Bassam Naim, a[] senior Hamas official," stated that "new blood" had been brought "back into [Hamas's] relationship with Iran." *Id.* at 19 (Clawson Decl. ¶ 51). Then, in 2014, "Hamas stepped up its terror activities," "kidnap[ping] and murder[ing] three teenagers[,] including [an] American citizen," and targeting rocket attacks at Israel. *Id.* at 19–20 (Clawson Decl. ¶ 52). "Iran issued statements strongly supporting Hamas's activities during this time and in the aftermath." *Id.* at 19 (Clawson Decl. ¶ 52). It also continued providing material support: "a freighter carrying 40 medium-range rockets was intercepted by Israeli commandos in 2014 in the Red Sea, a shipment they say was destined for Gaza." *Id.* at 20 (Clawson Decl. ¶ 52). Later that year, several Hamas officials, including Abu Obeida, a spokesman for Hamas's Qassam Brigades, acknowledged and praised Iran for its support of Hamas's fight against Israel, despite "Hamas's usual policy . . . [that it] does not . . . reveal the mechanism and details of the support it receives." *Id.* at 20–21 (Clawson Decl. ¶ 53).

In 2015, a visit by "Hamas leader Khaled M[e]shal[] . . . to Saudi Arabia was not well received in Iran," but Iran did not cut off Hamas and, instead, took "revenge on" Meshal by "bypass[ing]" him and providing support "'directly to the leaders of the group's military wing in the Gaza Strip.'" *Id.* at 21 (Clawson Decl. ¶ 55). By 2016, "Hamas-Iran relations were warm" again, "in no small part because Hamas had few alternative suppliers of arms and money." *Id.* at 22 (Clawson Decl. ¶ 56). And in 2017, after a visit from Hamas senior leadership, Ali Akbar Velayati, the advisor to the Leader of the Islamic Revolution in Iran, stated: "We are proud of supporting the Palestinian resistance and Hamas Movement. The Iranian leadership and our people will continue to support the resistance led by Hamas and Islamic Jihad." *Id.* (Clawson

Decl. ¶ 57).  "The Iran-Hamas relationship . . . continued consistently" throughout 2019, up to the time Plaintiffs filed the pending motion.  *Id.* at 23 (Clawson Decl. ¶ 58).

Based on the foregoing, unrebutted expert testimony, the Court finds that Iran provided material support in the form of arms, training, funds, and technology to Hamas from 1993 to at least 2019, "including in the period immediately before, during, and immediately after the November 19, 2015 attack at Gush Etzion Junction in which Ezra Schwartz was killed and Plaintiffs Michael Benzakein and Jason Geller were injured."  *Id.* (Clawson Decl. ¶ 59).

**B.     November 19, 2015 Attack**

1.     *The Attack*

On November 19, 2015, Ezra Schwartz, Michael Benzakein, and Jason Geller, each United States nationals spending the year abroad in Israel to do volunteer work, were "riding in a passenger van on their way to deliver care packages to Israeli soldiers and to beautify a park in honor of three Israeli teenagers who had been kidnapped and murdered" the previous year.  Dkt. 1 at 6 (Compl. ¶ 37); *see also id.* at 2–4 (Compl. ¶¶ 8, 16, 22); Dkt. 28-1 at 4 (Ruth Schwartz Decl. ¶ 18); Dkt. 28-6 at 3–4 (Michael Benzakein Decl. ¶¶ 4, 10–11); Dkt. 28-12 at 4–5 (Jason Geller Decl. ¶¶ 10–12).  As Plaintiffs' van approached the Gush Etzion Junction, a roundabout roughly twenty miles south of Jerusalem, "it encountered traffic and was forced to slow down."  Dkt. 1 at 6 (Compl. ¶ 38); *see also* Dkt. 28-6 at 3–4 (Michael Benzakein Decl. ¶ 13).

A Toyota Corolla with Israeli license plates approached from the west.  Dkt. 26 at 13–14, 26 (Spitzen Decl. ¶¶ 34–35, 65).  In the driver's seat was Muhammad Abd al-Basset Odeh al-Harub, "a Hamas operative" with a "longstanding intention to commit a terrorist attack," who had earlier that day set out "from his home in the Dir Sammet village . . . toward Gush Etzion Junction . . . to perpetrate a terrorist attack."  *Id.* at 13–14, 18, 26 (Spitzen Decl. ¶¶ 34–35, 47,

64).  Al-Harub was armed with "an Uzi submachine gun and three full magazines (75 bullets in all)," *id.* at 26 (Spitzen Decl. ¶ 64).

Each bullet was spent.  "[W]ith a line of cars heading from west to east" stalled in the junction, al-Harub "stuck his weapon outside the left window of his car" and began shooting.  *Id.* at 14, 26 (Spitzen Decl. ¶¶ 35, 65); *see also* Dkt. 1 at 6–7 (Compl. ¶¶ 39, 42–43); Dkt. 28-6 at 4 (Michael Benzakein Decl. ¶ 14); Dkt. 28-12 at 2 (Jason Geller Decl. ¶ 1).  He drove slowly, "taking aim at the nearby cars," "a passenger bus," and Plaintiffs' van.  *Id.* at 26–27 (Spitzen Decl. ¶¶ 66–67).  His "shots killed Ezra Schwartz . . . and injured Michael Benzakein and Jason Geller."  *Id.* at 26 (Spitzen Decl. ¶ 66).  When his three magazines of ammunition were expended, al-Harub "rammed his car forcefully into a car with Israeli license plates in order to injure more people."  *Id.* at 14, 26–27 (Spitzen Decl. ¶¶ 35, 67).

"After what seemed like hours, but was probably only minutes, Israeli soldiers" arrived at the scene, Dkt. 28-12 at 6 (Jason Geller Decl. 19), subduing and arresting al-Harub, Dkt. 26 at 27 (Spitzen Decl. ¶ 68).  Al-Harub was later "indicted and convicted by an Israeli military court for murdering three people and injuring several others."  *Id.* at 27 (Spitzen Decl. ¶ 68).  One of the murdered was Ezra Schwartz; two of the injured were Michael Benzakein and Jason Geller.

2.    *The Injuries to Plaintiffs*

Ezra Schwartz's estate and his immediate family, as well as Michael Benzakein, Jason Geller, and their immediate families, are the Plaintiffs here.  The families seek damages for the "emotional pain and suffering[] and mental anguish" that they suffered as a result of their children's injuries.  Dkt. 1 at 16 (Compl. ¶ 107).  The estate of Ezra Schwartz seeks damages for "wrongful death, lost wages and benefits, physical and emotional pain and suffering, and mental anguish."  *Id.* at 17 (Compl. ¶ 113).  And Michael Benzakein and Jason Geller seek damages for

11

emotional distress, lost employment opportunities (including concomitant wages and benefits), physical and emotional pain and suffering, and mental anguish.  *Id.* at 18–20 (Compl. ¶¶ 122–25, 133–35).  Each Plaintiff's claim of injury is substantiated.

*First*, as to the direct victims of the attack:  Ezra Schwartz "was shot in the head," Dkt. 28-12 at 2 (Jason Geller Decl. ¶ 1), leading to his death, *id.* at 5–6 (Jason Geller Decl. ¶ 17). Shrapnel and glass lacerated Jason Geller's knee and neck.  *Id.* at 2, 7 (Jason Geller Decl. ¶¶ 1, 21).  He attests that, after the attack, he "didn't travel like [he] had before," that he "was scared" while traveling, and that he "continued to dream about" Ezra.  *Id.* at 8–9 (Jason Geller Decl. ¶ 30).  Jason was also "referred to a trauma specialist while he was home, and . . . scheduled follow-up appointments with the specialist" for months afterword.  Dkt. 28-13 at 5 (Marc Geller Decl. ¶ 13).  Shrapnel "lodged in [Michael Benzakein's] knee," Dkt. 28-6 at 6 (Michael Benzakein Decl. ¶ 22), and he attests that, after the attack, he had "nightmares about the attack and also nightmares that were not about the attack, but in which someone ended up dying," *id.* at 9 (Michael Benzakein Decl. ¶ 36); that he "fe[els] constantly restless;" *id.*, that he has had to repeatedly visit a trauma specialist, *id.* (Michael Benzakein Decl. ¶ 37); that he cannot adequately pay attention in school, *id.* at 10 (Michael Benzakein Decl. ¶ 39); and that he has lost faith in his religion, developed anger issues, startles easily, has trouble sleeping, and "think[s] about the attack constantly," *id.* at 10–11 (Michael Benzakein Decl. ¶¶ 40–45).

*Second*, as to the families:  Ezra Schwartz's mother, Ruth Schwartz, attests that she "will always feel the trauma of that day," Dkt. 28-1 at 4 (Ruth Schwartz Decl. ¶ 16); that she "cr[ies] every day;" and that on some days there are "too many tears and too much emotion to function properly," *id.* at 8 (Ruth Schwartz Decl. ¶ 30).  "The hardest part of Ezra's death is that it is forever," she recounts.  *Id.* at 7 (Ruth Schwartz Decl. ¶ 26).  "Our family is broken forever. . . .

My children will never have their brother.  Their lives have been changed forever.  They will bear the trauma of that terrible day and Ezra's absence for their entire lives." *Id.* at 7 (Ruth Schwartz Decl. ¶ 27).  Similarly, Ezra's father, Ari Schwartz, attests that "[t]he pain of that day [of Ezra's death] and that week and the years that have followed cannot be described and cannot be quantified. . . .  It doesn't go away.  The feelings change and the thoughts change but the pain stays.  The pain does not ease, we just learn to live with it."  Dkt. 28-2 at 4 (Ari Schwartz Decl. ¶ 10).  And "[d]espite doing [his] best with the hand that [he] was dealt," Ari Schwartz attests, he "will never be the same person."  *Id.* at 5 (Ari Schwartz Decl. ¶ 17).  Ezra Schwartz's eldest sister's declaration is to the same effect:  "I often imagine my life if Ezra had not been killed. When I let myself think about it, I am still in utter shock.  I was introduced to a certain type of pain the day Ezra died, and that pain sits dormant inside me as I go about my everyday life. . . . It is the kind of pain that melts you, from the inside out. . . .  [It is a] disease without a treatment."  Dkt. 28-4 at 4 (Mollie Schwartz Decl. ¶ 15).  Ezra's younger brother likewise avers: "I still need[] my big brother. . . .  I still think about Ezra.  I still cry for him, and I still need the love and support of my older brother."  Dkt. 28-5 at 3 (H. Schwartz Decl. ¶ 12).  Finally, in a declaration submitted by their parents on their behaves, Ezra's two remaining siblings state that they "struggle with their feelings of fear and loss," "do not really have a good place to deal with" those feelings, and, to this day "attend a bereavement camp for siblings and children of victims of terror in Israel twice a year."  Dkt. 28-3 at 6 (Ruth and Ari Schwartz on behalf of E. Schwartz and A. Schwartz, minors, Decl. ¶ 25).

The Geller family's declarations make similar points.  *See, e.g.*, Dkt. 23-2 at 4 (*SEALED*) (Jacqueline Geller Decl. ¶¶ 8–9); *id.* at 9 (*SEALED*) (Sandra Geller Decl. ¶¶ 12,

14); Dkt. 28-13 at 5 (Marc Geller ¶ 13) (Jason's father acknowledging that he "must have been suppressing some anger" for months after the attack).

And so too do the declarations submitted by the Benzakein family. *See, e.g.*, Dkt. 28-7 at 11 (Betty Benzakein Decl. ¶ 36) (Michael's mother stating that, for months after the attack, she "felt panicked, anxious, sleepless," that she "didn't have the energy" to go to therapy); Dkt. 28-8 at 7 (Ralph Benzakein Decl. ¶ 23) (Michael's father explaining that "Michael's decision not to be observant" after the attack "hurts [him] in the extreme."); Dkt. 28-9 at 5 (Jacques Benzakein Decl. ¶ 16) (Michael's brother stating that he felt the "need to walk on eggshells" around Michael for "the first few years" after the attack, and that it is "tough to see how Michael's relationship with [his] parents has changed" since the attack.); Dkt. 28-11 at 3–4 (L. Benzakein Decl. ¶¶ 9–11) (Michael's youngest sibling averring the same) Dkt. 28-10 at 4 (Sabrina Benzakein Decl. ¶¶ 17–8) (Michael's sister explaining that she is now "more scared of being in Israel" and that her relationship with Michael has strained because she is "not sure [Michael's] sudden bad moods will ever stop" and because Michael has "changed for good.").

Based on this evidence, the Court finds that each of the Plaintiffs suffered a "personal injury or death" as a result of the November 19, 2015 attack.

3.    *Attribution to Hamas*

According to Colonel Arieh Dan Spitzen, an expert on Islamic terrorist groups, "Hamas was responsible for the November 19, 2015 [a]ttack at Gush Etzion Junction."  Dkt. 26 at 32 (Spitzen Decl. ¶ 88); *see also id.* at 4 (Spitzen Decl. ¶ 10).  Spitzen relies on three sources of evidence to reach his conclusion: "(1) public statements or acts that Hamas and al-Harub's family members made following the [a]ttack, (2) al-Harub's detailed and punctilious planning of

14

the [a]ttack, and (3) the resources needed and expended in perpetrating the [a]ttack." *Id.* at 4–5

(Spitzen Decl. ¶ 10).

First, as to the public statements or acts, Spitzen recounts that:

- "[T]he day after the attack, Hamas expressed its congratulations in a poster praising and glorifying al-Harub's deeds as heroic," *id.* at 28 (Spitzen Decl. ¶ 72);

- Three months after the attack, "Hamas issued a press release on its official website . . . calling upon the people in the Hebron area to support the famil[y] of . . . al-Harub," who, the release states, was an "excellent symbol[] of [the] *Hamas* movement's *operatives*," *id.* (Spitzen Decl. ¶ 73) (emphasis added);

- "Al-Harub's mother declared in 2016 that the people of the Qassam Brigades [Hamas's operational terror apparatus, *id.* at 4 (Spitzen Decl. ¶ 10)] . . . would free her son," and she made express reference "to names of senior officials of Hamas and the Qassam Brigades" during interviews she provided to the media, *id.* at 29 (Spitzen Decl. ¶ 75);

- Al-Harub's parents spoke at "Hamas sites" and gave an interview to a Hamas-affiliated website; a "Hamas flag accompanied the report" of one of these interviews; "posters shown in the course of [an] interview as background . . . stated that al-Harub . . . *belong[ed] to the Qassam Brigades*;" and, during other interviews, "al-Harub's organizational affiliation with Hamas and its operational terrorist apparatus was emphasized," *id.* (Spitzen Decl. ¶ 76) (emphasis added);

- "Posters explicitly noting that al-Harub was an operative of the Qassam Brigades . . . were displayed at al-Harub's home on February 23, 2016, immediately after it was destroyed by the IDF [Israeli Defense Forces]," *id.* at 28–29 (Spitzen Decl. ¶ 74);

- "[A]l-Harub's father received compensation from Hamas for the destruction of the family home," *id.* at 30 (Spitzen Decl. ¶ 77); and

- "Hamas officially claims responsibility for the [a]ttack[:] a senior Hamas figure publicly described al-Harub as a 'son of the Hamas movement,'" *id.* at 31 (Spitzen Decl. ¶ 87), a phrase that Hamas uses to refer to "its own operatives in various Hamas publications and posters [that] it distributed," *id*. at 12 (Spitzen Decl. ¶ 33).

In sum, as Spitzen explains, "[a]l-Harub's mother's public declarations supporting

Hamas's ideology, and her expressed confidence that the Qassam Brigades would arrange to

promptly free her terrorist son; declarations of other family members indicating support for Hamas; interviews supplied by the family to Hamas media and accompanied by Hamas symbols; . . . the family['s] [receipt of] compensation from Hamas for the destruction of their home by Israeli security forces . . . ; and the fact that no other terrorist organizations claimed responsibility for the [a]ttack—all support the conclusion that Hamas was responsible for the [a]ttack in which three people were killed, including Ezra Schwartz, and nine others were injured, including Plaintiffs Michael Benzakein and Jason Geller." *Id.* (Spitzen Decl. ¶ 79).

Second, further confirming Hamas's responsibility for the attack, according to Spitzen, is the evidence of "al-Harub's detailed and punctilious planning of the [a]ttack." *Id.* at 4–5 (Spitzen Decl. ¶ 10).  Spitzen notes that:

- Al-Harub's "Will describes his upcoming attack as an act of jihad for Allah's sake and for 'the defense of our nation and our honor,' which was crushed by 'the occupation and its herds of its settlers,'" *id.* at 16–17 (Spitzen Decl. ¶ 43), and Al-Harub "linked his decision to perpetrate a terrorist attack to his desire for vengeance against the Jews for the condition of the Palestinian people as well as the Jews' purported damaging of the al-Aqsa Mosque," *id.* at 16 (Spitzen Decl. ¶ 42);

- Many months before the attack, "[i]n February 2015, al-Harub purchased an Uzi submachine gun and three magazines of ammunition from a Bedouin of the Ramadin tribe;" he subsequently "purchased further ammunition, he examined the condition of the weapon[], cleaned [it], and oiled [it] every month after his shooting practice;" and he "preventively painted" the weapon[] and "concealed [it] in a hiding place, wrapping [it] in airtight bags to prevent rusting and preserve [it] in good working order," *id.* at 20–21 (Spitzen Decl. ¶¶ 52–54);

- He engaged in "regular training in operating the weapon and target practice," making "a point of practicing his shooting every month" at "an inconspicuous location outside his village so that he would not be discovered," *id.* at 21 (Spitzen Decl. ¶ 55); and

- His execution of the attack demonstrated a level of "operational performance clearly indicating prior training," and his "tactical driving while shooting and switching magazines, which is a very difficult task and requires

>   advanced skill generally acquired through lengthy organized practice, *id.* at
>   27 (Spitzen Decl. ¶ 69).

Based on these facts, Spitzen concludes that "[a]l-Harub's behavior and spoken and written

words before the [a]ttack demonstrate his adherence to the . . . ideology of Hamas and like-

minded terrorist organizations," *id.* (Spitzen Decl. ¶ 43); that "[h]is attention to operational

preparedness . . . was far more consistent with the operational discipline exhibited by members

of terror cells who operate within organizational frameworks," *id.* at 21–22 (Spitzen Decl. ¶ 56);

and that "the [a]ttack itself indicates long and precise preparation [consistent with] the behavior

of a terrorist who belonged to an organized, established terrorist organization that provided

logistical and operational backing to its operatives," *id.* at 27 (Spitzen Decl. ¶ 70).

Third, Spitzen explains that "the resources needed and expended in perpetrating the

[a]ttack" and the date of the attack further support his conclusion that Hamas bore responsibility

for the attack. *Id.* at 4–5 (Spitzen Decl. ¶ 10).  Spitzen notes that al-Harub expended roughly

$15,000 over two years accumulating weapons and ammunition.  *Id.* at 20 (Spitzen Decl. ¶ 53).

"That sum is exceptionally large and unusual for a young Palestinian," and, in Spitzen's view, "it

is very difficult to believe that the purchase[s] [were] made from al-Harub's own private

resources."  *Id.*  Finally, Spitzen explains that al-Harub selected the date of the attack—

November 19—"in part because it was the anniversary of the death of the namesake of Hamas's

operational terror apparatus, the Izz al- Din al-Qassam Brigades."  *Id.* at 28 (Spitzen Decl. ¶ 71).

All told, then, "[a]l-Harub's conduct was far more consistent with the operational discipline

exhibited by members of terror cells who operate within organizational frameworks."  *Id.* at 22

(Spitzen Decl. ¶ 56).

Based on the foregoing, Spitzen offers the expert opinion that al-Harub "was a Hamas

operative who committed the [a]ttack with the support and approval of Hamas," because of:

17

(1) his "profile, which reflects extremist, Islamist beliefs," *id.* at 28 (Spitzen Decl. ¶ 71); (2) his "decision to commit the [a]ttack on the anniversary of the death of Sheikh Izz al-Din al-Qassam," *id.*; "the operation and the level of professionalism al-Harub exhibited in preparing for the [a]ttack," *id.*; "the content of al-Harub's Will, which reflected signature Hamas . . . themes," *id.* at 4 (Spitzen Decl. ¶ 10); (5) the statements made by al-Harub's parents and the payment made by Hamas to al-Harub's father after the IDF destroyed the family home, *id.* at 29–30 (Spitzen Decl. ¶¶ 76–77); (6) the posters referring to al-Harub as "the Qassami prisoner," *id.* at 28 (Spitzen Decl. ¶ 74); and (7) "Hamas's celebration and identification of al-Harub after his arrest as one of its operatives," *id.* at 4 (Spitzen Decl. ¶ 10).

In light of Spitzen's unrebutted declaration, and cognizant of how difficult it is to obtain "firsthand evidence and eyewitness testimony" in terrorism cases, *Owens IV*, 864 F.3d at 785, the Court finds that Hamas was responsible for the November 19 attack.

### III.   CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject matter jurisdiction on federal district courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a), and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens IV*, 864 F.3d at 764–65.  The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow to effect service on a foreign state.  *See* 28 U.S.C. § 1608.

The Court must satisfy itself that Plaintiffs have cleared each of these hurdles, notwithstanding Defendant's failure to appear.  First, the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, and courts are "obligated to consider [their jurisdiction] *sua sponte*."  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable").  Second, with respect to the substance of a plaintiffs' federal (or state) law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the court is satisfied that the plaintiff has established her "right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86.  And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6 (footnote omitted).

Each of these inquiries implicates a slightly different standard of proof.  To establish subject-matter jurisdiction, a FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies."  *Owens IV*, 864 F.3d at 784.  When the plaintiff meets that burden of production, it must then "prove [its] case on the merits."  *Id.*  To do so, the plaintiff must "establish his . . . right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Although this provision's "protection against an unfounded default judgment" does not altogether "relieve[] the sovereign from the duty to defend," it does require the plaintiff to offer "admissible evidence" sufficient to "substantiate [the] essential element[s]" of his claim.  *Owens IV*, 864 F.3d at 785–86 (quotations omitted).  Finally, to establish personal jurisdiction

over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

As explained below, the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Iran. The Court also concludes that Plaintiffs have carried their burden of establishing a right to relief under the federal cause of action established in § 1605A. Finally, the Court will defer until the damages stage the determination of the damages to which each Plaintiff is entitled.

**A.      Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims**

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which the foreign state is not entitled to immunity under" the FSIA. 28 U.S.C. § 1330(a). This Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal (and state) courts in cases in which:

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception, moreover, applies only to suits in which two additional requirements are met. First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism

occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Second, the foreign state must be designated as a

state sponsor of terrorism both at the time the act occurred (or was so designated as a result of

the act) and at the time the lawsuit was filed (or was so designated within the six-month period

preceding the filing of the suit).[3]  *Id.* § 1605A(a)(2)(A)(i)(I); *see also Owens IV*, 864 F.3d at

763–64.

Several of the conditions for subject-matter jurisdiction are easily addressed in this case.

First, Plaintiffs expressly seek only monetary relief, costs and expenses, and attorneys' fees.

Dkt. 1 at 21 (Compl. Prayer for Relief).  Second, Iran was designated as a state sponsor of

terrorism in 1984, *see* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State

George P. Shultz) (Iran), and remains designated as such to this day, *see* U.S. Dep't of State,

*State Sponsors of Terrorism*, available at https://www.state.gov/state-sponsors-of-terrorism (last

visited November 23, 2020).  Third, at the time the Gush Etzion Junction attack occurred, each

Plaintiff here was a United States national.  Dkt. 1 at 4 (Compl. ¶ 26)

As a result, the only substantial jurisdictional question left for the Court is whether

Plaintiffs' claims are for "personal injury or death that [were] caused by . . . act[s] of torture,

extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an

"official, employee, or agent of" Iran or Syria.  28 U.S.C. § 1605A(a)(1).  For the reasons

explained below, the Court concludes as follows: (1) Hamas committed an act of  "extrajudicial

killing" within the meaning of the Torture Victim Protection Act; (2) Iran and its agents provided

"material support or resources" for the extrajudicial killings that caused Plaintiffs' injuries within

---

[3]  Section 1605A(a)(2) also requires that the foreign state have received "a reasonable
opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state
against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement
is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in
Iran.

the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the injuries or deaths suffered by Plaintiffs.  Plaintiffs' claims against Iran, therefore, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

       1.     *"Personal Injury or Death . . . Caused By" Defendant's Conduct*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts.  28 U.S.C. § 1605A(a)(1).  Here, Ezra Schwartz died and Plaintiffs Michael Benzakein and Jason Geller suffered physical injuries as a result of the Gush Etzion Junction terrorist attack.  Their claims, accordingly, satisfy the personal injury requirement of § 1605A(a)(1).  And because the statute is understood to encompass claims by close family members of those injured or killed for the distress caused by their relative's injuries, also known as solatium actions, *see* 28 U.S.C. § 1605A(c); *see also Salzman v. Islamic Republic of Iran*, No. 17-1745, 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019), the close relatives of Ezra Schwartz, Michael Benzakein, and Jason Geller also satisfy the personal injury requirement of § 1605A(a)(1).  A family member's claim for solatium damages resulting from a terrorist attack may be considered for FSIA purposes as a variety of claim for an intentional infliction of emotional distress, *see Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55 (D.D.C. 2012) ("*Oveissi II*"), and, as such, constitutes a "claim[] for personal injury," *id.* at 55.

       2.     *Hamas's Extrajudicial Killing*

To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies] or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  The FSIA looks to the Torture Victims Protection Act of 1991 ("TVPA")

to define "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  Under the TVPA, "extrajudicial

killing" means:

> a deliberated killing not authorized by a previous judgment pronounced by a
> regularly constituted court affording all the judicial guarantees which are
> recognized as indispensable by civilized peoples.  Such term, however, does not
> include any such killing that, under international law, is lawfully carried out
> under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  As the D.C. Circuit has explained, this

definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized

by a previous judgment pronounced by a regularly constituted court."  *Owens IV*, 864 F.3d at

770.

### a.   Killing

The Gush Etzion Junction attack constitutes an act of extrajudicial killing: Ezra Schwartz

and others died as a result of the terrorist attack.  Dkt. 28-12 at 2, 5–7 (Jason Geller Decl. ¶¶ 1,

17, 21); Dkt. 28-13 at 5 (Marc Geller Decl. ¶ 13); Dkt. 28-6 at 6, 9 (Michael Benzakein Decl.

¶ 22, 36).  Although Jason Geller and Michael Benzakein were not killed, "[s]everal decisions

from this district have held that individuals who are injured but not killed in an attack that results

in the death of others may recover for their injuries under § 1605A."  *Force v. Islamic Republic*

*of Iran*, 464 F. Supp. 3d 323, 360 (D.D.C. 2020) (citing *Karcher*, 396 F. Supp. 3d at 58; *Salzman*

*v. Islamic Republic of Iran*, No. 17-2475, 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019);

*Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 6, 14 (D.D.C. 2011); *Cohen v.*

*Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *Haim v. Islamic Republic of*

*Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011)).  Jason Geller and Michael Benzakein's injuries

were, like Ezra Schwartz's, "caused by" the "act of . . . extrajudicial killing"—a shooting that

killed three people and injured nine others, *see* Dkt. 26 at 13 (Spitzen Decl. ¶ 34).  *Salzman*,

2019 WL 4673761, at *12.  Indeed, they sat close to Ezra Schwartz when he was shot in the

head, as al-Harub deliberately sprayed their van with bullets in an effort to kill as many innocent people as he could.  It follows, moreover, that the personal injuries suffered by their family members were caused by the same act of extrajudicial killing.  *See* 28 U.S.C. § 1605A(c); *see also Salzman*, 2019 WL 4673761, at *12; *Oveissi II*, 879 F. Supp. 2d at 54–55.

>b.     Deliberated and Unauthorized

Plaintiffs must also show that the attacks that caused their injuries were "deliberated," in order to qualify as an "extrajudicial killing."  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens III*") (subsequent history omitted) (citing *Webster's Third New International Dictionary* 596 (1993); 4 *The Oxford English Dictionary* 414 (2d ed. 1989); *Black's Law Dictionary* 492 (9th ed. 2009)).

Here, there is ample evidence that the attacks in question were planned.  As Plaintiffs' expert Arieh Spitzen explains: "al-Harub prepared himself for the [a]ttack not only spiritually and emotionally, but also in the following ways: with intelligence-gathering, by selecting the site; with logistics, by purchasing the gun and ammunition; and operationally, by training to commit the attack."  Dkt. 26 at 18 (Spitzen Decl. ¶ 46); *see also id.* (Spitzen Decl. ¶ 47) ("Several unique features in the [a]ttack indicate al-Harub's longstanding intention to commit a terrorist attack, including punctilious planning, financing, intelligence gathering and training – all characteristic activity of an official and organized organization like Hamas."); *id.* at 27 (Spitzen Decl. ¶ 70) ("[Al-Harub's] preparations for the [a]ttack and of the [a]ttack itself indicates long and precise preparation for its commission[:]  Acquisition of weapons and logistical tools, operational and intelligence preparations, and strict secrecy . . . are all atypical of the 2015 terror wave, and they indicate the behavior of a terrorist who belonged to an organized,

established terrorist organization that provided logistical and operational backing for its
operatives.").

Finally, the attack was, without a doubt, perpetrated without "a prior judgment affording
judicial guarantees o[f] due process," *Foley*, 249 F. Supp. 3d at 202; *see also Owens IV*, 864 F.3d
at 770, or "under the [lawful] authority of a foreign nation," TVPA § 3(a).  To the contrary,
Hamas, a non-state actor, claimed responsibility for al-Harub's attack.  *See, e.g.*, Dkt. 26 at 28
(Spitzen Decl. ¶ 72) ("One day after the [a]ttack, Hamas expressed its congratulations in a poster
praising and glorifying al-Harub's deeds as heroic[.]"); *id.* (Spitzen Decl. ¶ 73) ("On February
24, 2016, Hamas issued a press release on its official website . . . calling upon the people in the
Hebron area to support the famil[y] of the prisoner[] Muhammad Abd al-Basset al-Harub[.]"
(quotation marks omitted)); *id.* (Spitzen Decl. ¶ 74) ("Posters explicitly noting that al-Harub was
an operative of the Qassam Brigades, (referring to him as 'the Qassami prisoner'), were
displayed at al-Harub's home on February 23, 2016 . . . and made clear publicly and openly that
Hamas was claiming the perpetrator of the November 19, 2015 [a]ttack . . . ."): *id.* at 31 (Spitzen
Decl. ¶ 87) ("Hamas officially claimed responsibility for the [a]ttack[, and] a senior Hamas
figure publicly described al-Harub as a son of the Hamas movement . . . ." (quotation marks
omitted)).

*          *          *

The Court, accordingly, concludes that the Gush Etzion Junction attack qualifies as an act
of "extrajudicial killing" under 28 U.S.C. § 1605A(a)(1).

3.   *Iran's Provision of Material Support for Hamas November 19, 2015 Extrajudicial
     Killing*

The FSIA's terrorism exception applies when a plaintiff seeks money damages for
"personal injury or death that was caused by . . . the provision of material support or resources

25

for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," so long as that support was provided by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. 1605A(a)(1).  Section 1605A(h)(3) defines "material support or resources" by reference to 18 U.S.C. § 2339A, the criminal material support statute.  Section 2339A defines "material support or resources" to mean:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The Court has found that, during the years leading up to and surrounding the attacks at issue, Iran provided millions—if not hundreds of millions—of dollars to Hamas.  *See supra* Part II.A.  Iran also provided substantial operational aid to Hamas, including weapons, training, and strategic support.  *See id*.  The Court therefore concludes that Iran provided Hamas "material support" in the form of, *inter alia*, "currency," "training," "expert . . . assistance," and "weapons" within the meaning the FSIA.  28 U.S.C. § 1605A(h)(4); 18 U.S.C. § 2339A(b)(1).

4.    *Causation*

The Court must also consider whether Plaintiffs' injuries were "caused by" provision of material support to Hamas.  28 U.S.C. § 1605A(a)(1).  Plaintiffs need not show that Iran "specifically knew of or intended its support to cause" the particular attacks in question, *Owens IV*, 864 F.3d at 798, or even that Iran's material support was a "but for" cause of their injuries, *Kilburn*, 376 F.3d at 1128.  Instead, the FSIA requires only a "showing of 'proximate cause,'" which is satisfied where a Plaintiff can show "some reasonable connection between the act or

26

omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984)).  This inquiry thus "contains two similar but distinct elements." *Owens IV*, 864 F.3d at 794.  "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).  "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (*Rothstein*, 708 at 91).

Plaintiffs have offered no evidence tying the provision of specific support from Iran to the Gush Etzion Junction attack.  But establishing that type of close nexus is unnecessary, because financial support and material aid are fungible and, more importantly, Iranian support helped make Hamas the force that it was in November 2015.  The FSIA does not condition Plaintiffs' recovery on Hamas's "careful bookkeeping." *Kilburn*, 376 F.3d at 1130.  Here, it is enough for Plaintiffs to have shown that Iran's financial and military aid to Hamas played a significant role in aiding its operational capacity.  It is uncontested that Iran provided material support to Hamas for nearly two-and-a-half decades, Dkt. 25 at 23 (Clawson Decl. ¶ 59); that Hamas accepted responsibility for the instant attack, claiming al-Harub as one of its own operatives, Dkt. 26 at 28 (Spitzen Decl. ¶ 73); and that Hamas's resources were at a minimum used in the attack's aftermath (payment to al-Harub's parents after their house was destroyed by the IDF, *id.* at 28–29 (Spitzen Decl. ¶ 74), and were likely used in the attack itself, *id.* at 20 (Spitzen Decl. ¶ 53) (suggesting Hamas funded al-Harub's purchase "of weapons and ammunition").  More generally, Iran's resources allowed Hamas to function as it did; indeed, as Spitzen attests, "Hamas had few alternative suppliers of arms and money" around the time of the attack, Dkt. 25 at 22 (Clawson Decl. ¶ 56).  The Court, accordingly, concludes that there is a

"reasonable connection" between Iran's support of Hamas and the instant attack, and that, therefore, Iran's support was a substantial factor in the attack that caused the Plaintiff's injuries.

The remaining question is whether Plaintiffs' injuries resulting from the attacks at issue were "reasonably foreseeable" or "natural consequence[s]" of Defendant's conduct. *Owens IV*, 864 F.3d at 794. They were. Iran not only materially supported Hamas, it actively encouraged Hamas to carry out attacks on civilians in Israel and provided Hamas the financial and military capabilities enabling those attacks. *See supra* Part II.A. Ezra Schwartz's death, Jason Geller and Michael Benzakein's injuries, and their families' immense emotional pain was, by any measure, a foreseeable result of Iran's sponsorship of terror. *Owens IV*, 864 F.3d at 797–98; *see also Salzman,* 2019 WL 4673761, at *14.

### 6.    *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief under the federal cause of action that Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception not relevant here: a foreign state is only liable to a limited class of individuals, namely, "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person, 28 U.S.C. § 1605A(c); *see also* Dkt. 1 at 4 (Compl. ¶ 26)

(alleging that "[e]ach Plaintiff was a United States citizen at all relevant times, including at the time of the [a]ttack").  Accordingly, for the same reasons that the Court has subject-matter jurisdiction, Plaintiffs have a statutory claim to relief.

**B.    Personal Jurisdiction**

The Court also concludes that it has personal jurisdiction over Defendant.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference," *id.*:

(1)    by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)    if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic

> channels to the foreign state and shall send to the clerk of the court a
> certified copy of the diplomatic note indicating when the papers were
> transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and

complaint either "in accordance with any special arrangement for service between the plaintiff

and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international

convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs

in this case.  *See* Dkt. 24 at 14; *Karcher*, 2019 WL 4017636, at *2.  No "special arrangement"

governs service between the United States and Iran, and Iran is not party to an international

convention on service of judicial documents.  *See Braun v. Islamic Republic of Iran*, 228 F.

Supp. 3d 64, 77–78 (D.D.C. 2017).  As a result, Plaintiffs attempted service under the third

alternative, which requires service by mail from "the clerk of the court to the head of the ministry

of foreign affairs of the foreign state."  28 U.S.C. § 1608(a)(3).  On June 20, 2018, Plaintiffs

initiated service as to all Defendants under § 1608(a)(3), Dkt. 7 and, at Plaintiffs' request, the

Clerk of Court mailed the relevant documents to Iran on June 22, 2018, Dkt. 8.  On July 9, 2018,

the Court notified Plaintiffs that the documents sent to Iran were returned undelivered.  Dkt. 9.

Plaintiffs then proceeded to serve Iran pursuant to 28 U.S.C. § 1608(a)(4).  Dkt. 24 at 14.

That provision requires service by mail from the clerk of court to the Secretary of State, who

must then transmit the required material "through diplomatic channels to the foreign state."  28

U.S.C. § 1608(a)(4).  The Department of State must then send "the clerk of the [C]ourt a

certified copy of the diplomatic note indicating when the papers were transmitted."  *Id.*  Plaintiffs

provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4)

on August 22, 2018.  Dkt. 11; *see also* Dkt. 12.  The Clerk mailed these materials to the State

Department on August 24, 2018.  Dkt. 13.  On November 28, 2018, the State Department notified the Clerk that the documents had been delivered to Iran through the Swiss Ministry of Foreign Affairs.  Dkt. 14 at 3.  As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the Government of Iran," the documents were transmitted to the Embassy of Switzerland in Tehran, Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on October 24, 2018.  *Id.* at 1.  After Iran failed to respond, the Clerk of Court entered a default.  Dkt. 22.

Because Plaintiffs accomplished service pursuant to 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Iran.  *See* 28 U.S.C. § 1330(b).

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the motion for default judgment, Dkt. 22, and the motion to file certain documents under seal, Dkt. 23, are **GRANTED**.  The Court will **APPOINT** a special master to hear Plaintiffs' damages claims and to report to the Court a recommendation as to the appropriate award.  A separate order appointing a special master and setting the terms of that appointment will follow.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 30, 2020