**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RUTH SCHWARTZ, ARI SCHWARTZ, RUTH SCHWARTZ AND ARI SCHWARTZ FOR THE ESTATE OF EZRA SCHWARTZ, MOLLIE SCHWARTZ, H.S., a minor, E.S., a minor, A.S., a minor, MICHAEL BENZAKEIN, BETTY BENZAKEIN, RALPH BENZAKEIN, JACQUES BENZAKEIN, S.B., a minor, L.B., a minor, JASON GELLER, SANDRA GELLER, MARC GELLER, and JACQUELINE GELLER,** | **Case No. 18-cv-1349 (RDM)** |

*Plaintiffs,*

-against-

**ISLAMIC REPUBLIC OF IRAN,**

*Defendant.*

**REPORT AND RECOMMENDATION OF SPECIAL
MASTER REGARDING COMPENSATORY DAMAGES**

The claims in this case arise out of a terrorist attack that occurred on November 19, 2015 at the Gush Etzion Junction, approximately 20 miles south of Jerusalem. Three United States Nationals – Ezra Schwartz, Jason Geller, and Michael Benzakein – who were spending a year in Israel before entering college – were riding in a van on the way to do some volunteer work. When the van approached Gush Etzion Junction, it became a target of a Hamas operative, armed with a submachine gun. The Hamas operative shot at multiple vehicles at the Junction, including the van in which the victims were riding. The shots killed Ezra Schwartz and injured Jason Geller and Michael Benzakein (the Direct Victims).

The 17 plaintiffs in this action consist of the two injured Direct Victims, the estate of the deceased victim, and the family members of all three victims. The Court granted a default judgment, and appointed the undersigned to prepare a report and recommendation on the issue of

1

compensatory damages.  The two injured victims – Jason Geller and Michael Benzakein – seek damages for their physical and psychological injuries.  The estate of Ezra Schwartz seeks economic damages.[1]  The family member plaintiffs seek solatium damages for emotional distress and psychological suffering.

## BRIEF BACKGROUND

Section 1605A(a) of the FSIA creates a private right of action for United States nationals, members of the U.S. armed forces, and United States government employees or contractors who are injured by terrorist acts carried out by officials, employees, or agents of a foreign state.  28 U.S.C. § 1605A(a).  Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages and pain and suffering damages.

The amount of compensatory damages depends on the facts, circumstances, and nature of the injuries (or death) as well as the applicable law.  In evaluating the extent and nature of injuries, I am entitled to rely on uncontroverted factual allegations that are supported by sworn testimony – affidavit, declaration or deposition testimony – and expert reports.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

The first section of this Report sets forth factual findings with respect to each plaintiff.  Next, I set forth the applicable legal standards and apply those standards to the factual findings to provide recommended damages awards for each plaintiff.

---

[1] The complaint asserts a claim for pain and suffering damages for the estate of Ezra Schwartz – but the estate elected not to pursue that claim.  See Proposed Findings and Conclusions [ECF No. 24] page 9, n. 1.

## FACTUAL FINDINGS

### I.    DIRECT VICTIMS

One of the three Direct Victims was killed in the terrorist attack.  The other two Direct Victims were injured.  The circumstances of the death or injury of each Direct Victim are detailed below.

### A.    Estate of Ezra Schwartz

Ezra Schwartz was a citizen of the United States.  He was in Israel attending a special program between high school and college.  Declaration of Michael Benzakein, ECF No. 28-6, ¶¶ 6, 7.  He was killed when a terrorist shot at the van in which he was riding – on his way to do some volunteer work.  *Id.* at ¶¶ 12, 24.  Based on the declaration testimony, Ezra Schwartz was sitting near a window in the van.  *Id.* at ¶ 12.  The terrorist shot at the van multiple times and one of those shots hit Ezra Schwartz in the head.  *Id.* at ¶¶ 16, 17.  The declaration testimony indicates that when Ezra Schwartz was shot, he immediately fell over bleeding from his head.  *Id.*  The declaration testimony in the record does not indicate that Ezra Schwartz was conscious after the shooting.  *See, e.g.,* Declaration of Jason Geller, ECF No. 28-12.

### B.    Michael Benzakein

Michael Benzakein is a citizen of the United States.  He submitted declaration testimony in support of his claim.  Declaration Michael Benzakein, ECF No. 28-6.  He was in Israel in the same program as Ezra Schwartz and the two were roommates.  *Id.* at ¶ 7.  On November 19, 2015, Michael Benzakein was riding in the same van on the way to do volunteer work.  *Id.* at ¶ 12.  He states that most of the passengers in the van were asleep when the attack began.  *Id.* at ¶ 13.  He was awake and when he heard loud noises, he thought at first that someone was throwing rocks.  *Id.* at ¶ 14.  When he realized that someone was shooting at the van, he screamed for everyone to get down.  *Id.*  He was terrified and thought he was going to die.  *Id.* at ¶ 15.  He sent a text message

to his family saying that he loved them.  *Id.* at ¶ 14.  He saw Ezra Schwartz laying with his head

on a seat across the aisle.  *Id.* at ¶ 16.  He saw blood pooling under Ezra's head.  *Id.*  He thought

Ezra's lips were moving.  *Id.*

He tried to help Ezra but was afraid to move him.  *Id.*  Soldiers arrived and ushered the

passengers off the van.  *Id.* at ¶ 17.  He was taken to a hospital where he was examined for injuries.

*Id.* at ¶ 22.  The doctors removed shrapnel from his knee.  *Id.*  He finally learned that Ezra had

died.  *Id.* at ¶ 24.  Two days later he flew to the United States for Ezra's funeral.  *Id.* at ¶ 30.

He returned to Israel but was unable to complete the program.  *Id.* at ¶ 38.  Although he

had been accepted to New York Institute of Technology he lost his 'spot' and eventually ended up

at another college.  *Id.* at ¶ 39.  He testified in his declaration that he has changed:  he lost his faith

and no longer has the commitment to his religion that he once had.  *Id.* at ¶ 40.  He states that he

has a temper, he startles at loud noises, he is watchful, he has nightmares, and he does not like

crowded places.  *Id.* at ¶¶ 41-44.  He thinks about the attack constantly.  *Id.* at ¶ 45.

C.    **Jason Geller**

Jason Geller is a citizen of the United States.  Jason Geller provided declaration testimony

in support of his claim.  Declaration of Jason Geller, ECF No. 28-12.  Jason Geller was in the same

program in Israel and also a passenger on the van.  *Id.* at ¶ 4.  He was injured in the attack:  he

suffered shrapnel wounds to the neck and leg.  *Id.* at ¶ 1.

Jason Geller joined this particular study program because it offered opportunities to work

on community service projects.  *Id.* at ¶ 4.  He and Ezra Schwartz were roommates and became

fast friends.  *Id.* at ¶ 8.  Jason Geller states that he boarded the van but then had to get off in order

to finish eating a granola bar.  *Id.* at ¶ 13.  When he again boarded the van, Ezra had taken Jason's

original seat.  *Id.*  Jason fell asleep during the van ride and woke up to loud noises and screaming.

*Id.* at ¶¶ 14, 15.  He saw Ezra's window explode.  *Id.* at ¶ 16.  He hit the floor but then saw Ezra

still in a seat with a wound on the right side of his head.  *Id.* at ¶ 17.  Jason attempted to staunch the flow of blood, but the wound was too big.  *Id.*  He saw Ezra convulsing.  *Id.*  Soldiers came and took Ezra to the hospital and ushered the other passengers off the van.  *Id.* at ¶ 19.  He was taken to a hospital where the doctors removed glass from his neck and leg.  *Id.* at ¶ 21.  He stayed at the hospital for two hours and then went to the home of his principal.  *Id.* at ¶ 24.  Before he left the hospital, he was told Ezra had died.  *Id.* at ¶ 23.  He then flew to the United States for Ezra's funeral.  *Id.* at ¶¶ 24, 25.

He participated in therapy sessions and eventually, he went back to Israel.  *Id.* at ¶¶ 28-30.  He described the ongoing effects of the attack: He continues to dream about Ezra, and he will not sit near windows.  *Id.* at ¶ 30.  He attended the trial of the terrorist shooter – and states that the family of the terrorist appeared proud and pleased.  *Id.* at ¶ 32.

He has graduated from college and has been accepted at the New York Police Department Police Academy.  *Id.* at ¶ 33. He intends to pursue studies in counter terrorism.  *Id.*

## II.     FAMILY MEMBERS OF DIRECT VICTIMS

The adult family members of the Direct Victims have provided declaration testimony about their experience, their relationship with the Direct Victims, their injuries, and the effect of the death or injury of the Direct Victims on their daily lives.  In addition, some adult family members have provided declaration testimony on behalf of family members who are minors.

### A.     FAMILY OF EZRA SCHWARTZ

#### 1.     Ruth Schwartz – Mother of Ezra Schwartz

Ruth Schwartz is the mother of Ezra Schwartz and a United States citizen.  Ruth Schwartz provided a declaration in support of her claim.  Declaration of Ruth Schwarz, ECF No. 28-1.  Mrs. Schwartz described the trauma of learning of her son's death.  *Id.* at ¶¶ 13-18.  She described how much she misses him and how much he is missed by the family and friends.  *Id.* at ¶¶ 29, 30.  Her

family will never be the same – it is broken. *Id.* at ¶ 26. She described a yearly ritual of taking a photo of the family on Mother's Day. *Id.* They no longer take these photos. *Id.* She cries every day. *Id.* at ¶ 30. When she hears things that Ezra would have liked, she wants to tell him. *Id.* at ¶ 21. She thinks of him every day and visits his grave daily. *Id.* at ¶ 31.

### 2.    Ari Schwartz – Father of Ezra Schwartz

Ari Schwartz is the father of Ezra Schwartz and is a United States citizen. Ari Schwartz filed a declaration in support of his claim. Declaration of Ari Schwartz, ECF No. 28-2. Ari Schwartz described the day of Ezra's death. *Id.* at ¶ 7. He learned that Ezra had been in a terrorist attack and that the situation was serious. *Id.* He felt helpless. *Id.* at ¶ 8. He started to arrange to travel to Israel to be with Ezra. *Id.* He went to the school to tell his younger children that Ezra had been in an attack. *Id.* at ¶ 9. When he arrived home, he learned that Ezra had died. *Id.* The pain will never go away. *Id.* at ¶ 10. He thinks about Ezra every day. *Id.* at ¶¶ 5, 12. He thinks about what Ezra would be doing now. *Id.* at ¶ 12. He misses him terribly. *Id.* at ¶ 6. He spent his life as parent working to keep his children safe, and yet the worst had happened. *Id.* at ¶ 10. Ezra's death is 'final' and 'all consuming'. *Id.* at ¶ 15. He described the suddenness and randomness in which his whole world, his whole existence, changed and the deep gnawing ache that is with him constantly. *Id.* at ¶¶ 22-23.

### 3.    Mollie Schwartz – Sister of Ezra Schwartz

Mollie Schwartz is the older sister of Ezra Schwartz and is a United States citizen. Mollie Schwartz submitted declaration testimony in support of her claim. Declaration of Mollie Schwartz, ECF No. 28-4.

Mollie Schwartz was in college when her brother was killed. *Id.* at ¶ 6. She learned of the attack from her father. *Id.* at ¶ 9. At first, she did not know that her brother had been killed but did know that he had been in an attack and it looked serious. *Id.* She was crying and shaking –

6

and went back to her dorm where she learned that Ezra had died. *Id.* at ¶¶ 12, 13.  She described crying for days. *Id.* at ¶ 14.  Her life changed for the worse that day. *Id.*  She is still in shock. *Id.* at ¶ 15.  She described the pain of her brother's death. *Id.*  She idolized her brother and loved him deeply. *Id.* at ¶¶ 17-19.  She endures life without him. *Id.* at ¶ 20.  She thinks about the life Ezra wanted and could have had and feels his loss even more than her own personal loss. *Id.*

### 4.    E.S., and A.S. – Minor Brothers of Ezra Schwartz

E.S. and A.S. are minors represented by their legal guardians Ruth Schwartz and Ari Schwartz.  They are Ezra's Schwartz's youngest brothers.  They are citizens of the United States. Ruth and Ari Schwartz submitted declaration testimony about the effects of Ezra's death on E.S. and A.S.  Declaration of Ruth and Ari Schwartz on Behalf of E.S. and A.S., ECF No. 28-3.

E.S. was 11 years old when Ezra died. *Id.* at ¶ 11.  Ruth and Ari Schwartz testified that Ezra was a role model for E.S. and helped E.S. overcome insecurities. *Id.* at ¶¶ 12, 13.  Ezra's death has been hard on E.S. *Id.* at ¶ 14.  E.S.'s feelings about religion have changed. *Id.* He struggles in school. *Id.*  He does not understand how God could allow this to happen to Ezra. *Id.*

Ezra's parents state that A.S. had a very special relationship with Ezra. *Id.* at ¶ 15.  A.S. was 9 years old when Ezra was killed. *Id.*  He had extreme anxiety when he learned of Ezra's death. *Id.* at ¶ 18.  He cried, he was in a state of panic, he did not want to go away. *Id.*  He thinks about Ezra all the time and worries about safety, death, and tragedy. *Id.* at ¶¶ 22, 23.  Ezra's death will forever play a role in A.S.'s life and decisions. *Id.* at ¶ 24. Both of the brothers attend bereavement camp – and struggle with their feelings of fear and loss. *Id.* at ¶ 25.

### 5.    H.S. – Younger Brother of Ezra Schwartz

H.S. was a minor when this action was filed.  He is the oldest of Ezra's three younger brothers.  He submitted a declaration in support of his claim.  Declaration of H.S., ECF No. 28-5. He is a United State citizen. *Id.* at ¶ 3.  He states that Ezra was his role model and that the day

Ezra was killed was the worst day of his life. *Id.* at ¶¶ 6, 8. He misses his brother. *Id.* at ¶ 14. He still cries for him and still needs his love and support. *Id.* at ¶ 12.

### B.   FAMILY OF MICHAEL BENZAKEIN

#### 1.   Betty Benzakein – Mother of Michel Benzakein

Betty Benzakein is a citizen of the United States. She is the mother of Michael Benzakein. She submitted declaration testimony in support of her claim. Declaration of Betty Benzakein, ECF No. 28-7. Betty Benzakein describes her feelings of horror and terror upon learning that her son had been involved in a terrorist attack. *Id.* at ¶¶ 11, 14-20. She states that the experience was particularly devastating for her because it caused her to relive an incident many years earlier when her daughter was in a car accident. *Id.* at ¶¶ 3, 36. She felt panicked and anxious. *Id.* at ¶¶ 15, 36. She described Michael's constant questions about what he observed when Ezra was shot. *Id.* at ¶ 19. She testified that Michael is a changed person: he has lost his former faith in religion; he became moody and irritable; he was edgy and nervous where he used to be happy and joyful. *Id.* at ¶ 11. The family 'tiptoed' around Michael. *Id.* at ¶ 28. She states that Michael was afraid to sleep and had nightmares. *Id.* at ¶ 27. She explains that he saw a trauma specialist for a while. *Id.* at ¶ 28. She testified that Michael cannot decide on his future: he dropped his plans to become an engineer and cannot decide on an educational major. *Id.* at ¶ 32.

#### 2.   Ralph Benzakein – Father of Michel Benzakein

Ralph Benzakein is a citizen of the United States. He is the father of Michael Benzakein. He submitted a declaration in support of his claim. Declaration of Ralph Benzakein, ECF No. 28-8. Ralph Benzakein described his feelings when he heard that Michael was involved in a terror attack – but did not yet know Michael's condition. *Id.* at ¶¶ 11-15. He was 'beside' himself. *Id.* at ¶ 12. He made plans to head to Israel immediately. *Id.* at ¶¶ 12, 15. He finally received a call from Michael who kept asking about the condition of his friend Ezra. *Id.* at ¶ 13. He has observed

Ezra 'shaking' and wanted to know what that meant. *Id.* He still did now know whether Michael was safe. *Id.* at ¶ 14. About two hours later he finally learned that Michael was not seriously injured and was safe. *Id.* at ¶ 15. When he first saw Michael after the attack, he could tell that Michael was changed and in shock. *Id.* at ¶¶ 18, 19. He described how Michael sat on the floor of the car when they were driving back from the funeral. *Id.* at ¶ 21. He states that Michael could not sleep for months and would often stay up and drive the car all night – with no particular destination. *Id.* He states that Michael's loss of interest in religion is hurtful and describes their relationship as strained. *Id.* at ¶ 23. He prays that Michael will find his way. *Id.* at ¶ 26.

### 3.     Jacques Benzakein – Brother of Michael Benzakein

Jacques Benzakein is a United States citizen. He is the older brother of Michael Benzakein. Jacques Benzakein submitted a declaration in support of his claim. Declaration of Jacques Benzakein, ECF No. 28-9. Jacques Benzakein is a year older than Michael. *Id.* at ¶ 2. He describes their relationship as close. *Id.* They had the same friends and liked the same television shows. *Id.* Jacques was in Israel when Michael's van was attacked. *Id.* at ¶ 3. When he learned of the attack, he went out into the woods and cried. *Id.* at ¶ 6. And then he went to the hospital to be with Michael. *Id.* at ¶ 9. Although he knew at that point that Michael was alive, he did not know whether Michael had been injured. *Id.* at ¶ 5. He brought clothing and food for Michael and his friends. *Id.* at ¶ 7. He accompanied Michael back to the rabbi's house that evening and went with Michael to the airport where a special ceremony was held for Ezra. *Id.* at ¶ 12. Jacques, like his parents, states that Michael's personality and demeanor changed after the attack. *Id.* at ¶¶ 11-15. The family felt like they had to walk on 'eggshells' around Michael. *Id.* at ¶ 14. Michael was irritable and jumpy. *Id.* at ¶ 13. He states that Michael's relationship with his parents has changed. *Id.* at ¶ 14.

### 4.      Sabrina Benzakein – Sister of Michael Benzakein

Sabrina Benzakein is the younger sister of Michael Benzakein.  She is a citizen of the United States.  Although the complaint lists her as a minor, she is now an adult and has submitted a declaration in support of her claim.  Declaration of Sabrina Benzakein, ECF No. 28-10.  In her declaration, Sabrina describes Michael as the sibling with whom she has the closest relationship. *Id.* at ¶ 3.  She was 14 years old and in school when the attack occurred.  *Id.* at ¶ 4.  She learned of the attack, and Michael's short call to report that he had been in a shooting, and broke down sobbing.  *Id.*  She kept making calls and reading reports but could not get any information.  *Id.* When she returned home, she finally learned that Michael was safe.  *Id.*

She states that Michael was 'changed' by the attack.  *Id.* at ¶ 7.  Before the attack, he had an amazing personality.  *Id.* at ¶ 3.  After the attack he became snappy, aloof, moody and angry. *Id.*  For some time after the attack, he often would not sleep alone.  *Id.* at ¶ 5.  She states that the therapy sessions Michael attended helped somewhat and that their relationship is coming back slowly – but he will never be the same person.  *Id.* at ¶¶ 6, 7.

Sabrina states that the attack has made her fearful.  *Id.* at ¶ 8.  She won't sit near windows and she was terrified when she traveled with her family to Israel for a wedding.  *Id.* at ¶ 8.

### 5.      L.B. – A Minor Represented by Her Legal Guardians Betty Benzakein and Ralph Benzakein

L.B. is a citizen of the United States.  She is a minor represented by her legal guardians Betty Benzakein and Ralph Benzakein.  She is the youngest sister of Michael Benzakein.  L.B. submitted a declaration in support of her claim.  Declaration of L.B., ECF No. 28-11.  L.B. was 11 years old at the time of the attack.  *Id.* at ¶ 2.  She describes Michael as 'the best brother'.  *Id.* at ¶ 3.  She missed him when he was in Israel and called him every Friday.  *Id.* at ¶ 4.  She learned that her brother had been in a terrorist attack when she returned home from school that day.  *Id.* at

¶ 5.  At first, she thought Michael had been hurt but her sister Sabrina assured her that Michael was safe.  *Id.*  She was scared and felt lost.  *Id.* at ¶ 6.  When Michael arrived home a few days later, he looked horrible.  *Id.* at ¶ 8.  She describes Michael as 'changed'.  *Id.* at ¶ 9.  He used to like to go out, but after the attack he just sat at home.  *Id.* at ¶ 10.  She also states that she feels the need to be careful around Michael and that he  easily gets angry and frustrated.  *Id.*

### C.    FAMILY OF JASON GELLER

Jason Geller's mother and sister have both filed declarations under seal.  Accordingly, I have redacted those portions of this report that recount the testimony of those two individuals in the version filed on the public docket.

### 1.    Sandra Geller – Mother of Jason Geller

Sandra Geller is a United States citizen.  She is the mother of Jason Geller. She submitted a declaration in support of her claim, which was filed under seal.  Declaration of Sandra Geller, ECF No. 30.

Sandra states █████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████
       ██████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

### 2.     Marc Geller – Father of Jason Geller

Marc Geller is a United States citizen.  He is the father of Jason Geller.  He submitted a declaration in support of his claim.  Declaration of Marc Geller, ECF No. 28-13.  Marc Geller described learning of the attack.  *Id.* at ¶¶ 6, 7.  He noted a call from Jason but did not pick up the phone immediately.  *Id.* at ¶ 6.  Then he got a text from Jason stating to pick up the phone now. *Id.*  He immediately answered – and learned about the attack.  *Id.*  Jason reported that he had been in an attack and was afraid that his friend was dead.  *Id.*  Marc maintained communications with Jason until Jason arrived at the hospital.  *Id.* at ¶ 7.  Once he knew Jason was safe, he told his wife Sandra about the attack.  *Id.*  The family then worked through the logistics of getting Jason home for Ezra's funeral.  *Id.* at ¶ 8.  He met Jason at the plane – and also saw Ezra's parents – meeting the same plane to collect the body of their son.  *Id.*  On the way to the funeral, Jason sat on the floor of the van.  *Id.* at ¶ 9.  Marc was glad to see that Jason was able to meet with a trauma specialist.  *Id.* at ¶ 13.  Then Jason decided to go back to Israel.  *Id.* at ¶ 14.  Marc was concerned and decided that he would travel to Israel a few weeks later and if Jason was not doing well, would bring him home.  *Id.*  Marc traveled to Israel, as agreed.  *Id.*  He realized that he was not handling the attack well when he visited the school in Israel and became upset that they did not have armed guards.  *Id.* at ¶ 15.

### 3.     Jacqueline Geller – Sister of Jason Geller

Jacqueline Geller is a United States citizen.  She is the sister of Jason Geller.  She submitted a declaration in support of her claim, which was filed under seal.  Declaration of Jacqueline Geller,

ECF No. 30.



## DETERMINATION OF COMPENSATORY DAMAGES

## I.   ECONOMIC LOSS UNDER THE FSIA:  APPLICABLE LAW

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)).  *See also Roth*, 78 F. Supp. 3d at 402; *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Economic loss damages must be supported by credible evidence, and may be proven by the submission of a forensic economist's expert report that is based on reasonable data and assumptions.  *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 24 (D.D.C. 2009)).  "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *see also Thuneibat*, 167 F. Supp. 3d at 48-49 (finding satisfactory evidence to support

economic loss award in expert reports from forensic economists that were based on data provided by the National Center for Health Statistics, information submitted by the immediate family members of the two victims, and the expert's own expertise where loss wages and benefits were calculated and offset with estimates of personal consumption, based on data from the U.S. Department of Labor, Bureau of Labor Statistics, and where the resulting value was discounted "based on the rate of return on U.S. Treasury Bills based on Historical H.15 data from the Board of Governors of the Federal Reserve System"); *Belkin*, 667 F. Supp. 2d at 24 (awarding economic damages based on conclusion that expert testimony was based on reasonable assumptions about plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits).

The Estate of Ezra Schwartz seeks economic loss. The two injured Direct Victims do not seek an award of economic loss.

### A.     ECONOMIC LOSS DAMAGES for DIRECT VICTIM EZRA SCHWARTZ

The Estate of Ezra Schwartz seeks economic loss damages and has submitted an economic loss computation prepared by Steven Wolf in support of that claim.  Declaration of Steven Wolf, ECF No. 27.  Steven Wolf has a Master of Business Administration from Temple University and is a Certified Public Accountant.  He has provided expert testimony in 19 cases in the past four years.  *Id.* at pp. 11-12.  He has prepared economic loss reports in several cases under the FSIA. He is currently employed as a partner in the firm of Cherry Bekaert LLP, a top 25 accounting firm with 1,100 employees.  Based on his background and experience, I believe that Mr. Wolf qualifies as an expert for the purpose of computing economic loss in this matter.

Mr. Wolf based his economic loss calculation on the assumption that Mr. Schwartz would have completed undergraduate school and obtained a Master's in Business Administration.[2]  He concluded that Mr. Schwartz would have begun employment using that degree in 2022 in a major metropolitan area.

To compute the lost future wages, Mr. Wolf assumed that Mr. Schwartz would have been paid a starting salary equal to the national median salary for young males (computed in 2022 dollars).[3]  He further assumed that Mr. Schwartz would have worked consistently until age 67, the social security eligible retirement age.  Mr. Wolf assumed a salary growth rate of 4.5% annually (which is greater than the historical inflation rate but is described as accounting for a modest 'real' growth rate).[4]  *Id.* at ¶ 14.  He did not incorporate any assumptions for stock options or increased salaries in a major metropolitan area.  *Id.* at ¶ 13.  The calculations account for taxes that would be deducted from earnings – at an assumed effective tax rate of 20%.  *Id.* at ¶ 15.  Mr. Wolf further applied a deduction for personal maintenance.[5]  The percentage of income deducted for personal maintenance is based on the 2014-2015 Consumer Expenditure Survey (CEX), and is adjusted throughout the assumed work life to account for periods when Mr. Schwartz was assumed to be single, married, or married with children – in other words, the computation reflects an assumed life pattern that might be characterized as 'traditional'.  *Id.* at ¶ 18.  The portion of income devoted

---

[2] Mr. Wolf bases this assumption primarily on the declarations of Ezra Schwartz's parents, the fact that Ezra Schwartz was scheduled to begin undergraduate school after completing the program in Israel, and the fact that his parents both have advanced degrees.  Declaration of Steven Wolf, ECF No. 27, at 12.

[3] Mr. Wolf used the median salary as reported in U.S. Department of Education, National Center for Education Statistics (2018). *The Condition of Education 2018* (NCES 2018- I 44), Annual Earnings of Young Adults, available at https:/ /nces.ed.gov/pubs2018/2018144.pdf, pp. 249-51.

[4] Salary growth of course may be based on merit, performance, and cost of living.  The value applied here is an amount that modestly exceeds the historical inflation rate.  *Id.* at ¶ 14.

[5] Generally, in computing lost wages in a wrongful death case, the economist will deduct an amount for personal consumption (reflecting the portion of the wages that the deceased individual would consume for him or herself).  In this case, Mr. Wolf applied a personal maintenance deduction – reflecting the amount of the wages necessary for the decedent to maintain himself in the professional work force.  The application of a personal consumption factor or personal maintenance factor varies by jurisdiction.

to personal maintenance decreases as the family size increases.  As the children grow older and become independent, the personal maintenance deduction increases because the victim would be consuming a greater percentage of the income to support himself.  Mr. Wolf applied a personal maintenance deduction of 50% when Mr. Schwartz was assumed to be single, and then applied deductions of 33% and 25% (when Mr. Schwartz was assumed to have first one and then a second child).  *Id.* at ¶ 19.  After the assumed children would have become adults, the personal maintenance was adjusted upward to 50%.  *Id.*  Mr. Wolf incorporated a value for 'fringe benefits' of 31.4% based on a Department of Labor Statistics Study.[6]  *Id.* at ¶ 21.  Applying the above data, Mr. Wolf calculates future wages and fringe benefits during each year of the assumed work life, adds the growth factor for each year, reduces the resulting value to account for taxes and personal maintenance, and then applies a present value discount.  Mr. Wolf uses a discount rate of 3.48% based on the 20-year average of the yield on high grade municipal bonds.  Using the above assumptions and methodology, Mr. Wolf calculates the present value of the future economic loss as $3,676,050.  Mr. Wolf characterizes this value as conservative and notes that it does not account for out of pocket expenses the family has incurred.

The economic loss report applies a generally accepted methodology – accounting for wage growth and benefits and accounting for factors that would reduce the 'loss' each year.  The values applied are derived from reliable sources.  While experts might differ on the source of data for the discount rate, the use of the municipal bond rate is a reasonable source.  The issues presented are whether the assumptions about future education, career, and personal family structure are reasonable and supportable.

---

[6] U.S. Department of Labor, Bureau of Labor Statistics, https://data.bls.gov/timeseries/cuur0000sa0?series id=cwur0000sa0.

<u>Education/Career</u>:  There is support in the case law for applying assumptions about future educational activities and earnings capacity where the victim was killed before embarking on a career path and where there is a basis – for example in the victim's educational history or family situation – to support such an assumption.  *See, e.g. Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243-44 (D.D.C. 2012) (awarding economic loss damages for death of 14 year old based in part on finding that the decedent had been accepted to a prestigious school and had above average grades); *Roth*, 78 F. Supp. 3d at 405 (finding economic loss computation based on assumption that victim, who was 15 at time of death, would have obtained a graduate degree given the high level of academic achievement in her family).

Mr. Wolf relied on similar factors to support his assumption that Mr.  Schwartz would have attained a post graduate degree and would have maintained a traditional work life.  *See supra*, fn. 2.

<u>Personal Maintenance Assumptions</u>:  The calculation appropriately applies deductions for 'self-maintenance' and the percentage deductions  are based on reliable and reasonable sources. The only question is whether it is reasonable to assume that Mr. Schwartz would have married and had two children.  (As noted, these assumptions reduce the personal maintenance deduction and therefore increase the total estimate of loss). These assumptions are not per se unreasonable:  it is clear that Mr. Schwartz had a loving and vibrant family life growing up, and had strong religious beliefs.  There is no reason to assume that he would not follow this assumed  'traditional' family path.[7]  Mr. Wolf has opined that these are reasonable assumptions and accordingly, I recommend accepting these assumptions as part of the economic loss computation.

---

[7] Experts consider issues related to future family growth and its resulting effect on the decedent's career in computing economic loss. *See* Stanley P. Stephenson, PhD, *How Economists Compute Lost Earnings and Other Economic Damages in Personal Injury Cases*, James Publishing, (December 2013), available at https://www.litigationeconomics.com/PDF/eguide-eco-damages.pdf  (last accessed August 20, 2021), at § 3.10, (discussing the issue of damages in the case of individuals who lack earnings history, and stating: "Damages experts

Mr. Wolf's  analysis is consistent with generally accepted practices for the computation of lost earnings and is based on reasonable and reliable data and applies appropriate assumptions.  I believe that the report is credible and reliable and I therefore recommend accepting the economic loss calculation provided by the expert.  Accordingly, I recommend an economic loss award for the Estate of Ezra Schwartz in the amount of $3,676,050 – which is a present value number as of October 31, 2019.

## II.     NON-ECONOMIC DAMAGES: DIRECT VICTIMS

### A.     Non-Economic Damages for Deceased Victim:  Estate of Ezra Schwartz

The estate of Ezra Schwartz does not seek non-economic loss damages.  *See* Plaintiff's Proposed Conclusions Of Law In Support Of Their Renewed Motion For Default Judgment, ECF No. 24, ¶ 21, n.1.

### B.     Non-Economic Damages for Direct Victims Jason Geller and Michael Benzakein

Jason Gellar and Michael Benzakein both suffered physical injuries in the terror attack and seek an award for their pain and suffering.   As courts have recognized, it is difficult to place a dollar value on pain and suffering, particularly in the case of terrorist attacks.  Decisions in previous cases provide important guidance, but, of course, each case must be analyzed based on the facts and evidence and each case presents unique circumstances.  The case law outlines general considerations and ranges of values for victims who have been injured but not killed in terrorist attacks.  In general, the cases have identified a 'baseline' award that may be increased or decreased based on the severity of the injuries and the ongoing physical and psychological effects.  In a case

---

in such cases, especially those involving young women, may for example, forecast and make adjustments for future marriage, presence and number of children, and associated time out of the labor market to care for such "hypothetical children.").

where the victim survives a terrorist attack but suffers from substantial injuries, the courts have adopted a baseline award of $5 million for pain and suffering – subject to upward or downward adjustment to account for the circumstances, duration, and severity of injuries. *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d, 24, 37-38 (D.D.C. 2012). In cases where the victim has suffered no or 'mild' physical injuries with no lasting physical impact, courts have awarded amounts considerably lower than the $5 million baseline. Courts also consider whether a victim has suffered psychological injuries and, in such cases, courts have awarded damages based on the severity and duration of and need for ongoing treatment for the psychological injury. In considering damages in such cases, courts take into account the circumstances of the attack, including the psychological effects of witnessing the death or severe injury of family members or close friends during the attack. *See, e.g., Thuneibat*, 167 F. Supp. 3d at 51. "In Peterson II, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id.* at 54. This approach is not rigidly applied, however, and this Court has indicated it will "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F. Supp. 2d at 84, and will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012) (citation and internal quotation marks omitted). For servicemen suffering emotional, but no physical injury, this Court has adopted a general framework for the calculation of pain and suffering damages whereby they are "typically awarded $1.5 million." *Relvas v. Islamic Republic of Iran*, 2018 WL 1092445, at *2 (D.D.C. Feb. 28, 2018); *Wamai v. Republic of Sudan*, 60 F.Supp.3d 84, 92 (D.D.C., 2014). In some cases

involving emotional as opposed to physical injury, courts have found higher amounts appropriate where the victim continues to undergo treatment for the psychological injuries or the injuries are disabling.  *See, e.g., Cohen v. Islamic Republic of Iran*, 268 F.Supp.3d 19, 25 (D.D.C., 2017) (holding that a victim's physical injuries, while significant, were not as severe as that of other FSIA plaintiffs, but the extent of her emotional injury is unique, which warranted a higher award amount). In other cases, where the victim's emotional distress appears to be related to loss of income or speculation about what could have happened, courts have awarded lower amounts – often less than $1 million.  *See, e.g.*, *Kaplan v. Hezbollah*, 213 F.Supp.3d 27, 37 (D.D.C., 2016).

### 1.    Non-Economic Damages for Injured Victim Michael Benzakein

Plaintiff Michael Benzakein seeks non-economic pain and suffering damages for his physical and emotional injuries in the amount of $1,500,000.  Mr. Benzakein suffered minor shrapnel injuries and did not require hospitalization or treatment. Declaration of Michael Benzakein, ECF No. 28-6, ¶¶ 22-23.  It is clear, however, that Mr. Benzakein suffered from and continues to suffer from emotional distress and psychological injuries.  He was only 18 years old at the time of the attack.  He experienced intense fear – thinking he would be killed in the attack (*id.* at ¶ 15).  He saw his roommate and friend killed by a bullet wound to the head. *Id.* at ¶ 16.  His uncontroverted testimony and the uncontroverted testimony of his family demonstrate that he has changed fundamentally as a result of this experience – and that he continues to experience emotional trauma.  *Id.* at ¶¶ 40-45.  He is affected by loud noises, he cannot sleep, he has nightmares.  He has developed a 'temper'. *Id.* at ¶ 41.  He thinks about the attack every day.  *Id.* at ¶ 45.  The amount requested, $1,500,000, is reasonable and consistent with relevant case law.  Accordingly, I recommend an award of $1,500,000 for the pain and suffering experienced by Michael Benzakein.

### 2. Non-Economic Damages for Injured Victim Jason Geller

Plaintiff Jason Geller seeks non-economic pain and suffering damages for his physical and emotional injuries in the amount of $1,500,000. Mr. Geller also suffered mild shrapnel injuries that did not require hospitalization or ongoing treatment. Declaration of Jason Geller, ECF No. 28-12, at ¶¶ 21-22. Mr. Geller witnessed the fatal injuries suffered by Mr. Schwartz – his friend and roommate. *Id.* at ¶ 17. He testified that he attempted to staunch the flow of blood when Ezra was hit by the terrorist's bullets but there was too much blood. *Id.* Mr. Geller states that even while he was trying to help, he somehow knew that Ezra was already dead. *Id.* He testified that he was in shock. *Id.* at ¶ 18. He saw a psychologist weekly while he was in the United States. *Id.* at ¶ 28. He states that seeing Ezra get shot has 'stayed' with him. *Id.* at ¶ 30. He does not like to sit near windows. *Id.* His family members testified in their declarations that Jason Geller sat on the floor of the shuttle van at the airport – instead of in a seat. Declaration of Marc Geller, ECF No. 28-13, at ¶ 9. One of his parents testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ Declaration of Sandra Geller, ECF No. 30, ¶ 11.

Mr. Geller was a direct eyewitness to the violent attack on and death of his friend – when he was only 18 years old. The attack has affected him in myriad ways – and the uncontroverted testimony of Mr. Geller and his family members demonstrate ongoing emotional and psychological trauma. Accordingly, the amount requested, $1,500,00, is reasonable and appropriate and consistent with the relevant case law. I recommend a compensatory award for Mr. Jason Geller in the amount of $1,500,000.

## III. NON-ECONOMIC/SOLATIUM DAMAGES CLAIMS OF FAMILY MEMBERS OF DIRECT VICTIMS

Section 1605A(c) expressly provides for solatium damages to immediate family members of the victims. Solatium damages provide compensation for mental anguish, grief, and loss of

society and comfort.  *See Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.  Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).

The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan,* 213 F. Supp. 3d at 38 ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish.  As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

Immediate family members need not be present at the attack in order to be eligible for solatium damages.  *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (*Cohen I*) ("Solatium claims are typically brought by family members who were not present or injured themselves"); *id*. at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if

they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

Accordingly, an immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

There is a significant body of case law in this Circuit outlining the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks. Solatium damages vary depending on whether the victim was killed or injured, and on other factors including "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*"). In *Heiser I*, the court conducted a survey of decisions of the district courts in the District of Columbia circuit and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." 466 F. Supp. 2d at 269 (footnotes omitted). Courts have often applied these amounts as guideposts in evaluating damages and have concluded that these amounts, while relevant, are

neither mandatory nor applicable in all cases.  *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018).

Similarly, courts in this district have outlined guidance for evaluating solatium damages in cases where the victim was injured.  Several courts have awarded solatium damages to family members of living victims that range from $4 million for a spouse of the victim, $2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  *See, e.g., Anderson v. Islamic Republic of Iran,* 839 F. Supp. 2d 263, 266 (D.D.C. 2012).  Courts typically have awarded higher amounts of solatium damages – both in cases involving the death of the victim and in cases involving injured victims – where there are more extreme circumstances – such as where a family member is under medical care for depression or where the testimony makes clear that the family member continues to experience and feel the loss and change or where the family member is aware that the victim suffered horribly while captive.

The award must therefore be determined with reference to the baseline framework values but taking into consideration the particular facts of each case.

**A.  Damages Recommendations for Family Members of Direct Victims.**

As discussed above, the adult or near adult family members of the Direct Victims have provided competent, credible, and informative declaration testimony regarding their relationship with the victim and the effects of the victim's death or injuries on their emotional and psychological health.  Adult family members have also provided competent and credible testimony on behalf of family members who are minors – addressing the relationship between those family members and the victim and the effect of the victim's death or injury on the minors.  Following are my recommendations regarding solatium damages and the basis for each proposed award.

### 1.    Family of Ezra Schwartz

The testimony establishes the extremely close relationship between Ezra Schwartz and his parents and siblings. Ezra's parents and older siblings submitted compelling and consistent declaration testimony demonstrating the devastation, grief, emotional distress, and ongoing effects of loss resulting from Ezra's death.  The declaration of Ruth and Ari Schwartz on behalf of the two youngest siblings documents the ongoing and significant effects of Ezra's death on the children – who continue to struggle with fear and loss and have been forever changed by the loss of their older brother.  The uncontroverted testimony thus establishes the grounds for an award of solatium damages.

Plaintiffs request solatium awards consistent with the 'baseline' framework – specifically, $5 million each for Ari and Ruth Schwartz as the parents of Ezra Schwartz, and $2.5 million for each of Ezra's siblings.  The record supports awards in the requested amounts – each of the family members demonstrated their close familial relationship and ongoing effects of Ezra's death.  There is no basis to deviate downward from the presumed 'baseline' award.  Accordingly, I recommend the following solatium awards:

Ari Schwartz – $5,000,000

Ruth Schwartz – $5,000,000

Mollie Schwartz – $2,500,000

H.S. – $2,500,000

A.S. – $2,500,000

E.S. – $2,500,000

### 2.    Family of Michael Benzakein

The testimony establishes the close familial relationship between Michael Benzakein and his parents and siblings.  Each of the members of the family presented credible, clear, consistent,

and compelling testimony about their close relationships.  Each of the members of the family described their concerns for Michael and the ongoing effects of the attack on Michael and his family.  The attack on Michael has affected and continues to affect each of his parents and siblings. Their family dynamic has changed, and they all continue to experience distress as a result.

Accordingly, the family of Michael Benzakein has established the basis for an award of solatium damages.  The family requests awards in the amount of $850,000 for Michael's parents – Betty Benzakein and Ralph Benzakein and awards in the amount of $500,000 for each of Michael's siblings.  These amounts are consistent with decisions noting that solatium damages should not exceed the amount awarded to the direct injured victim and that where the award to the direct victim is lower than the 'baseline', the solatium awards should be computed proportionally. *See, e.g., Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7 (D.D.C.2012); *Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 22 (D.D.C. 2019).  The proposed awards are reasonable, and if anything, perhaps low.  It is clear that while Michael did not suffer serious physical injury, the attack changed him and all the members of his family, irrevocably.

Based on the relevant case law, and the uncontroverted testimony, I recommend the following solatium awards for the members of Michael Benzakein's family:

Betty Benzakein – $850,000

Ralph Benzakein – $850,000

Jacques Benzakein – $500,000

Sabrina Benzakein – $500,000

L.B. – $500,000

### 3.  Family of Jason Geller

The testimony establishes the requisite familial relationship between Direct Victim Jason Geller and all the members of his family.  Each family member submitted credible, compelling

and consistent testimony describing the effects of the attack on their lives and their relationships. The testimony establishes that the family dynamic has been affected by the attack and that the family relationships have suffered as a result. Each member of the family expressed their ongoing anger, grief, and worry resulting from the attack. They are angry about the events and about the effects on Jason. Their testimony establishes a loss of happiness and ongoing distress.

Accordingly, the family of Jason Geller has established the basis for an award of solatium damages. The family members have requested awards consistent with those requested by the Benzakein family: $850,000 for each of Jason Geller's parents and $500,000 for Jason Geller's sister.

As noted above, these amounts are consistent with relevant case law, and perhaps could be viewed as low given the lasting effects of the attack on the family. I recommend following solatium awards:

Sandra Geller – $850,000

Marc Geller – $850,000

Jacqueline Geller – $500,000

## IV.   PREJUDGMENT INTEREST

Plaintiffs requested prejudgment interest. This Court has previously confirmed that prejudgment interest may be appropriate in cases brought under the FSIA. *See Fritz*, 324 F. Supp. 3d at 63-65. Several decisions in this Circuit have held that prejudgment interest is appropriate on pain and suffering and solatium awards and economic loss. *See id.* at 64 (awarding prejudgment interest on the past economic loss of the direct victims as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families); *Wamai*, 60 F. Supp. 3d at 98 ("[p]rejudgment interest is appropriate on the whole award, including pain and suffering and solatium" and past economic loss, but not on present economic loss); *Khaliq v. Republic of*

*Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014) ("[p]rejudgment interest is appropriate on the whole

award, including pain and suffering and solatium"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp.

3d 36, 46 (D.D.C. 2014) (same as *Wamai*); *Mwani v. Al Qaeda*, 2014 WL 4749182, at *13 (D.D.C.

2014) (awarding prejudgment interest on compensatory but not punitive damages).  As the court

in *Wamai* reasoned:

> Awards for pain and suffering and solatium are calculated without
> reference to the time elapsed since the attacks. Because plaintiffs were
> unable to bring their claims immediately after the attacks, they lost use of
> the money to which they were entitled upon incurring their injuries.
> Denying prejudgment interest on these damages would allow defendants
> to profit from the use of the money over the last fifteen years. Awarding
> prejudgment interest, on the other hand, reimburses plaintiffs for the time
> value of money, treating the awards as if they were awarded promptly and
> invested by plaintiffs.

60 F. Supp. 3d at 98.  I recommend that, consistent with precedent, prejudgment interest be

awarded starting from the date of the attack through the date of final judgment at the applicable

federal prime rate for non-economic loss damages and for solatium damages.  *Id.*; *see also Sheikh*

*v. Republic of Sudan*, 485 F. Supp. 3d 255, 274-75 (D.D.C. 2020); *Christie v. Islamic Republic of*

*Iran*, 2020 WL 3606273, at *19-20 (D.D.C. 2020); *Ewan v. Islamic Republic of Iran*, 466 F. Supp.

3d 236, 250-51 (D.D.C. 2020); *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 12 (D.D.C. 2020);

*Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n. 10-12.[8]  I have not included prejudgment

interest for the economic loss award for the Estate of Ezra Schwartz:  Prior case law disfavors

prejudgment interest for the computed future economic loss – on the theory that applying

prejudgment interest to an amount that has already been reduced to present value (using, in many

---

[8] I note that some courts have declined to award prejudgment interest, concluding that the compensatory awards provide full compensation for pain and suffering. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), aff'd, 554 F. App'x 16 (D.C. Cir. 2014) (deciding that the plaintiffs were already fully compensated from the pain and suffering and solatium damages); *Roth*, 78 F. Supp. 3d at 404 (holding that "the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing"); *Thuneibat*, 167 F. Supp. 3d at 48 (holding that "the solatium damages awarded are complete and prejudgment interest is not necessary to make the plaintiffs whole").

cases a different interest rate) would result in an inappropriate calculation.  Here, the entire amount of the economic loss damages for the Estate of Ezra Schwartz is estimated future loss – there is no past economic loss.  I note that the loss is stated as a present value as of October 31, 2019.  If the present value were to be computed as of the date of judgment, the amount would be different.

I have provided such a calculation below through the end of August 2021 for the Court's convenience.  Prejudgment interest is calculated at the prime rate for each year from the date of the attack (November 19, 2015) using the methodology described in *Fritz, supra*, 324 F. Supp. 3d at 64, 67 n. 2.  A multiplier was calculated using the Federal Reserve's data for the average annual prime rate from November 19, 2015 through August 2021.  *See* Bd. of Governors of the Fed. Reserve  Sys.  Historical  Data,  available  at  https://www.federalreserve.gov/datadownload /Choose.aspx?rel=H15  (last accessed on August 20, 2021).[9]  Consistent with *Fritz*, I estimated that rate from January through August 2021 to be 3.25%, which is the current rate.

To calculate the multiplier, I multiplied $1.00 by the prime rate in 2015, and then multiplied the resulting product by the percentage of the days of the year remaining as of the date of the attack. I then added that product to $1.00. Next, I multiplied that amount by the prime rate the following year and added that amount. Continuing this iterative process through August 2021 yields a multiplier of 1.264.[10]  As the Court explained in *Wamai* and *Opati*, "[t]he product of the

---

[9]  The rates applied are as follows:
> 2015:  3.26 (applied only for portion of year)
> 2016:  3.51
> 2017:  4.1
> 2018:  4.91
> 2019:  5.28
> 2020:  3.54
> 2021:  3.25 (current rate; applied through August).

[10]  I note that in Plaintiffs' Proposed Conclusions of Law in Support of Their Renewed Motion for Default Judgment (ECF No. 24), filed in 2019, Plaintiffs proposed multiplying their emotional injury awards by 0.1973, which they calculated by adding annual interest rates for 2015-2019 with 2019 estimated at 3.946%. *Id.* at ¶ 64. The calculation reflected herein is different due to the passage of time and the fact that the 2019 rate was higher than estimated. Additionally, the multiplier used herein applies interest for 2015 only for the period after the attack and for 2021 through August 2021.

multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award." *Wamai*, 60 F. Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12.

## SUMMARY OF RECOMMENDATIONS

| | Pain and Suffering – Physical Injuries and Emotional/Psychological Distress Damages / Solatium Damages | Economic Loss | Prejudgment Interest | Total With Prejudgment Interest |
|---|---|---|---|---|
| **Ezra Schwartz** | - | **$3,676,050** | - | **$3,676,050** |
| Ruth Schwartz | $5,000,000 | - | $1,320,118 | $6,320,118 |
| Ari Schwartz | $5,000,000 | - | $1,320,118 | $6,320,118 |
| Mollie Schwartz | $2,500,000 | - | $660,059 | $3,160,059 |
| E.S. | $2,500,000 | - | $660,059 | $3,160,059 |
| A.S. | $2,500,000 | - | $660,059 | $3,160,059 |
| H.S. | $2,500,000 | - | $660,059 | $3,160,059 |
| **Michael Benzakein** | **$1,500,000** | **-** | **$396,035** | **$1,896,035** |
| Betty Benzakein | $850,000 | - | $224,420 | $1,074,420 |
| Ralph Benzakein | $850,000 | - | $224,420 | $1,074,420 |
| Jacques Benzakein | $500,000 | - | $132,012 | $632,012 |
| Sabrina Benzakein | $500,000 | - | $132,012 | $632,012 |
| L.B. | $500,000 | - | $132,012 | $632,012 |
| **Jason Geller** | **$1,500,000** | **-** | **$396,035** | **$1,896,035** |
| Sandra Geller | $850,000 | - | $224,420 | $1,074,420 |
| Marc Geller | $850,000 | - | $224,420 | $1,074,420 |
| Jacqueline Geller | $500,000 | - | $132,012 | $632,012 |

Dated: August 23, 2021

Respectfully submitted,


By:  *s/ Deborah E. Greenspan*
　　　Deborah E. Greenspan, Esq.
　　　Special Master