## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SCHWARTZ, *et al.*,

      *Plaintiffs*,

      v.                                          Civil Action No. 18-1349 (RDM)

ISLAMIC REPUBLIC OF IRAN,

      *Defendant*.

### <u>MEMORANDUM OPINION</u>

On November 19, 2015, Ezra Schwartz, Michael Benzakein, and Jason Geller, three United States nationals spending a year abroad in Israel, were riding in a passenger van on their way to a community service project when an operative from the Islamic Resistance Movement ("Hamas") pulled up alongside them and open fired with an Uzi submachine gun.  Dkt. 29 at 10–11; *see also* Dkt. 28-6 at 4 (Michael Benzakein Decl. ¶ 14); Dkt. 28-12 at 2 (Jason Geller Decl. ¶ 1).  The Hamas operative fired a total of 75 bullets, killing Schwartz and injuring Benzakein and Geller.  Dkt. 29 at 11.

Plaintiffs—Schwartz's estate, Benzakein, Geller, and family members of each of the three victims—subsequently filed this suit against the Islamic Republic of Iran ("Iran"), alleging that Iran "gave substantial aid, assistance and encouragement to Hamas . . . with the specific intention of causing and facilitating the commission of acts of extrajudicial killing," including the November 2015 submachine gun attack.  Dkt. 1 at 13 (Compl. ¶ 91).  Plaintiffs effected service on Iran on October 24, 2018, Dkt. 14 at 1, but Iran neither appeared nor answered

1

Plaintiffs' complaint.  Plaintiffs moved for default judgment, Dkt. 22, and this Court granted that motion on November 30, 2020, concluding that Plaintiffs properly invoked the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a), as well as the cause of action provided for by that same statute.  Dkt. 29 at 31.

For assistance in evaluating Plaintiffs' damages, the Court referred the case to a special master, Deborah Greenspan, to prepare a report and recommendations regarding compensatory, but not punitive, damages.  *See* Dkt. 31.  The Special Master's resulting report lays out the effects that the November 2015 attack had on each of the victims and their families and carefully analyzes Plaintiffs' claims for damages under the applicable framework for state-sponsored terrorism cases.  *See* Dkt. 32.  The Court thanks the Special Master for her excellent assistance. In response to the Special Master's report, Plaintiffs filed a notice indicating they have "no objections" to her recommendations.  Dkt. 34 at 1.

As explained below, the Court adopts the Special Master's proposed findings and recommendations and also awards punitive damages to Plaintiffs.

## ANALYSIS

As an initial matter, the Court agrees with, and adopts without modification, the Special Master's findings of fact, all of which are well-explained and supported by the record.  Tracking the Special Master's report, the Court will first review her conclusions with respect to the economic and non-economic damages that those findings support and will then turn to the question of punitive damages, which (consistent with the Court's referral) is not addressed in the Special Master's report.  The Court concludes with the question of prejudgment interest.

2

A.    **Economic Damages**

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(c)).  Traditionally, plaintiffs may prove economic losses by the submission of a forensic economist's expert report.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).  When evaluating an expert's calculations, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert."  *Id.* at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)).

Only the estate of Ezra Schwartz seeks economic damages here.  In support of this claim, the estate has submitted an economic loss computation by Steven Wolf, a certified public accountant who has provided testimony as either an accounting or economic damages expert (or both) in 19 cases in recent years, including several FSIA cases. Dkt. 27 at 11–12 (Wolf Decl., Ex. A).  Wolf represents that he has also testified as an accounting and valuation expert regarding economic damages for the September 11th Victim Compensation Fund.  *Id.* at 1–2 (Wolf Decl. ¶ 2).  As the Special Master observes, Wolf holds a Master of Business Administration from Temple University and is currently a partner with the Cherry Bekaert LLP, a large national accounting firm.  Dkt. 32 at 14.  In the view of the Special Master, Wolf is qualified as an expert for the purpose of determining economic loss.  *Id.*  The Court agrees.

As for Wolf's findings, the Special Master found that his assumptions were "reasonable" and that his analysis was "consistent with generally accepted practices for the computation of lost earnings and [were] based on reasonable and reliable data."  *Id.* at 17–18.  Accordingly, the

Special Master recommends that the Court adopt Wolf's proposal as the award of economic loss

for the estate of Ezra Schwartz.  *Id.* at 18.  The Court agrees and will adopt his recommendations

and award economic loss damages to the estate of Ezra Schwartz in the amount of $3,676,050.

**B.     Non-Economic Damages**

Benzakein and Geller seek non-economic damages for the pain and suffering that resulted

from the November 2015 attack, while family members of all three victims seek solatium

damages.  The Court addresses each request in turn.

1.     *Pain and Suffering for Michael Benzakein*

Plaintiff Michael Benzakein seeks $1.5 million in non-economic damages for his pain

and suffering resulting from the November 2015 attack.  Dkt. 24 at 23.  In assessing this request,

the Special Master notes that, although Benzakein "suffered minor shrapnel injuries," he "saw

his roommate and friend"—Schwartz—"killed by a bullet wound to the head" during the attack.

Dkt. 32 at 20.  This experience, according to the Special Master, has had a profound impact on

Benzakein, who "suffered from and continues to suffer from emotional distress and

psychological injuries," as evidenced by his "uncontroverted testimony . . . that he has changed

fundamentally" as a result of the attack.  *Id.* (citing Dkt. 28-6 at 10–11 (Michael Benzakein Decl.

¶¶ 41, 45)).  In light of these ongoing injuries, the Special Master concludes that Benzakein's

request "is reasonable and consistent with relevant case law," and recommends awarding him

$1.5 million for his pain and suffering.  *Id.*

The Court agrees.  Placing a dollar amount on these kinds of harms "can be difficult."

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (quotation marks

omitted).  There is no market, economic study, or scientific analysis that the Court can employ.

4

Courts do find significant guidance, however, in the principle that "individuals with similar injuries [should] receive similar awards." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010) (quotation marks omitted) . And "[i]n the case of victims who suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 40 (D.D.C. 2018) (quotation marks omitted); *accord Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 36 (D.D.C. 2016). Here, as the Special Master points out, Benzakein's emotional trauma is borne out by both his declaration and declarations from family members in support of his request. Dkt. 32 at 20; *see also* Dkt. 28-6 (Michael Benzakein Decl.); Dkt. 28-7 (Betty Benzakein Decl.); Dkt. 28-8 (Ralph Benzakein Decl.); Dkt. 28-9 (Jacques Benzakein Decl.); Dkt. 28-10 (Sabrina Benzakein Decl.); Dkt. 28-11 (L.B. Decl.). The Court will, accordingly, award $1.5 million in non-economic damages to Benzakein.

2. *Pain and Suffering for Jason Geller*

Plaintiff Jason Geller also seeks $1.5 million in non-economic damages. Dkt. 24 at 23. The Special Master notes that Geller "was a direct eyewitness to the violent attack on and death of his friend . . . when he was only 18 years old," and points to his testimony that "he attempted to staunch the flow of blood when Ezra was hit by the terrorist's bullets but there was too much blood." Dkt. 32 at 21. She also notes that Geller sustained wounds to his neck and leg, where doctors had to remove shards of glass. *Id.* at 4–5. The "uncontroverted testimony" from Geller and his family, according to the Special Master, "demonstrate [Geller's] ongoing emotional and psychological trauma." *Id.* at 21 (citing Dkt. 28-12 at 5–6 (Jason Geller Decl. ¶ 17)); *see also* Dkt. 23-2 at 2–4 (Jacqueline Geller Decl.); *id.* at 5–9 (Sandra Geller Decl.); Dkt. 28-13 (Marc

Geller Decl.).  Given this evidence, the Special Master finds that Geller's request for damages is, like Benzakein's, "reasonable and appropriate and consistent with the relevant case law."  Dkt. 32 at 21.  The Court, once more guided by the principle that "individuals with similar injuries receive similar awards," *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012) (quotation marks omitted), agrees and will award $1.5 million in non-economic damages to Geller, *cf. Akins*, 332 F. Supp. 3d at 40; *Kaplan*, 213 F. Supp. 3d at 36.

      3.    *Solatium for Family Members*

      Family members of each of the three victims seek solatium damages in various amounts. Dkt. 24 at 23–27.  Such damages are intended to compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  "Solatium claims are typically brought by family members who were not present or injured themselves."  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*"); *see also* 28 U.S.C. § 1605A(c).  There exists a "'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish[,] and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages,'" *Kaplan*, 213 F. Supp. 3d at 38 (alterations omitted) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)).

      "Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable."  *Moradi*, 77 F. Supp. 3d at 72.  But, as with the latter, courts have identified certain baselines that help ensure that similarly situated victims receive comparable awards.

Specifically, courts in this district have followed the framework set out in *Heiser I*, which concluded that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*") (footnotes omitted).  These amounts, however, are merely guideposts, and the Court may deviate depending on the specific circumstances of a given case.  *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361–62 (D.C. Cir. 2018).  Solatium damages are also available to family members of injured victims.  As the Special Master observes, solatium damages where the victim is still living typically range from $4 million for a spouse of the victim, $2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  Dkt. 32 at 24 (citing *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012)).

Turning to the case at hand, each family member has presented evidence to the Court and the Special Master demonstrating his or her close relationship to the respective direct victims and the irreparable loss he or she continues to bear.  *See* Dkt. 23-2; Dkt. 28-1–5, 7–11, 13.  This record demonstrates that the November 2015 terrorist attack, and the resulting death of Schwartz and injuries to Benzakein, have inflicted profound emotional, physical, and financial harm on each of these families.  The Special Master has considered the individual circumstances of each of the plaintiffs and has recommended an amount for each.  Dkt. 32 at 25–27.  Given the comprehensive evidence of devastating individualized grief and loss in the record, the Court agrees and will adopt the Special Master's recommendations regarding each of these family members.

7

C.      **Punitive Damages**

Plaintiffs also seek punitive damages.  Dkt. 24 at 31–32.  Punitive damages "serve to punish and deter the actions for which they awarded," *Valore*, 700 F. Supp. 2d at 87, and are expressly contemplated by the FSIA, *see* 28 U.S.C. § 1605A(c).  Pursuant to this Court's order, *see* Dkt. 31 at 1, the Special Master did not consider, and did not calculate, an appropriate award of punitive damages.  Rather, the Court reserved this task for itself, which it takes up now.

In cases brought under the FSIA, courts have concluded that "[p]unitive damages are warranted where defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others."  *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017).  Here, the Court has already concluded that "Iran provided material support in the form of arms, training, funds, and technology to Hamas from 1993 to at least 2019, including in the period immediately before, during, and immediately after the November 19, 2015 attack at Gush Etzion Junction in which Ezra Schwartz was killed and Plaintiffs Michael Benzakein and Jason Geller were injured."  Dkt. 29 at 10.  The Court is, accordingly, persuaded that Plaintiffs are entitled to punitive damages.

In determining the amount of punitive damages to award, courts typically consider four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Fritz v. Islamic Rep. of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018) (quotations marks and citations omitted).  These factors militate in favor of a sizable award here. As to the first two factors, Iran's actions enabled Hamas to carry out a lethal and seemingly

random act of terror as part of a sustained effort to instill fear in the people of Israel.  As to the third factor, because Iran's provision of material support to militant groups for the purpose of harming Americans is "part of a longstanding pattern and policy, . . . the need for deterrence [is] clear." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017).  Finally, "Iran is a sovereign and has substantial wealth." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

In practice, determining the precise amount has generally involved applying a multiplier to a base amount (referred to as the "multiplicand").  *See Harrison*, 882 F. Supp. 2d at 50.  As to the multiplicand, some decisions have utilized the defendant's annual expenditures on terrorist activities, *see, e.g.*, *Valore*, 700 F. Supp. 2d at 88, while others have used the amount of compensatory damages already awarded, *see, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017), and still others have considered both these factors together, *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 166–67.[1]  But where, as here, "Plaintiffs have not provided sufficient evidence as to Iran's expenditures" and the underlying acts are not "as 'exceptionally' deadly or substantial as those in cases where the total-expenditures multiplicand has been used," "the appropriate multiplicand is the total compensatory damages already awarded." *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 10 (D.D.C. 2019); *cf. Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010) (using the total-expenditures multiplicand for claims arising from the Beirut bombing where 241 Americans were killed).

---

[1]  Yet another option courts have employed is to forgo the multiplicand and multiplier approach and instead impose a fixed sum of $300 or $150 million per family in FSIA terrorism cases. *Thuneibat*, 167 F. Supp. 3d at 54 (collecting cases).

This leaves, then, the question of the appropriate multiplier.  Courts in this jurisdiction have frequently used a multiplier between one and five depending on various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities.  *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 73 (multiplier of one where Iranian authorities directly detained and tortured, but did not kill, plaintiff); *Hekmati*, 278 F. Supp. 3d at 167 (same); *Fritz*, 324 F. Supp. 3d at 65 (multiplier of two for a case involving hostage-taking and killing by terror organization the defendant supported); *Harrison*, 882 F. Supp. at 50 (multiplier of three for the bombing of the U.S.S. Cole where plaintiffs presented no evidence relating to defendant's expenditures on terrorist activities);  *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 3 (D.D.C. 2011) (multiplier of three for a suicide bombing that killed eight); *Valore*, 700 F. Supp. 2d at 88 (multiplier of five for victims of the Beirut bombing where plaintiffs presented expert testimony on the deterrence effect of punitive damages).

Turning to the case at hand, the Court concludes that a multiplier of two is appropriate. This Court has applied that multiplier in cases in which Iran provided material support to a terrorist organization that abducted, tortured, and later executed the plaintiff.  *See Fritz*, 324 F. Supp. 3d at 58; *see also Hamen*, 407 F. Supp. 3d at 11 (similar).  And although Plaintiffs are correct, Dkt. 32 at 23, that at least one decision of this Court has applied a multiplier of three in a case involving a shooting attack in which no one died, that decision began from the premise that "[t]he multiple other members of this Court have used has ranged between three and, in exceptional cases, five," *Gill*, 249 F. Supp. 3d at 106.  But the appropriate range of multipliers

spans one to five.  *See Fritz*, 324 F. Supp. 3d at 58.  To be sure, the underlying acts here are

indisputably vile and tragic.  But so too were the acts at issue in prior cases in which the Court

has concluded a multiplier of two is appropriate, *see id.* at 58; *Hamen*, 407 F. Supp. 3d at 11.

Plaintiffs, moreover, have presented little evidence regarding the potential deterrence effect of a

larger multiplier, *see Bluth*, 203 F. Supp. 3d at 26, particularly given the many billions of dollars

in damages already awarded against Iran in similar cases.

The Court will, accordingly, award Plaintiffs punitive damages in an amount equal to

twice their compensatory damages.  Consistent with other decisions in this circuit, the award of

punitive damages will be apportioned among the estate and each individual plaintiff "relative to

their individual compensatory awards."  *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19,

28 (D.D.C. 2017) ("*Cohen II*").

## D.     Prejudgment Interest

The final issue before the Court involves prejudgment interest.  Plaintiffs have requested,

and the Special Master recommends, that the Court award Plaintiffs prejudgment interest on at

least some portions of their compensatory damages award.  Dkt. 32 at 27–28.  "The decision to

award prejudgment interest, as well as how to compute that interest, rests within the discretion of

the court, subject to equitable considerations."  *Baker v. Socialist People's Libyan Arab*

*Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011).  "The purpose of such awards is to

compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v.*

*Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997).  Accordingly, "[p]rejudgment interest is

an element of complete compensation."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44,

59 (D.D.C. 2012) (quoting *West Virginia v. United States*, 479 U.S. 305, 311–12 (1987)).

Although a growing chorus of decisions has awarded prejudgment interest for at least some damages under the FSIA, the Special Master is correct that this result has not been unanimous.  Dkt. 32 at 28 n.8 (collecting cases).  This Court, however, already considered this very issue in *Fritz v. Islamic Republic of Iran* and concluded that prejudgment interest was appropriate "on the past economic loss of the direct victims as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families."  324 F. Supp. 3d at 64.  The Court sees no reason to revisit that conclusion here and will, accordingly, award Plaintiffs prejudgment interest on their non-economic damages—that is, those damages awarded to Benzakein and Geller for their pain and suffering and the solatium damages awarded to the families of all three victims.  The Special Master does not, however, recommend prejudgment interest for the economic damages awarded to Schwartz's estate because "the entire amount of the economic loss damages for the Estate of Ezra Schwartz is estimated future loss—there is no past economic loss."  Dkt. 32 at 29.  Plaintiffs have not objected to this recommendation, *see* Dkt. 34, so the Court will not award prejudgment interest on these forward-looking economic damages.

As for how the Court will calculate that interest, "[t]he D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest."  *Fritz*, 324 F. Supp. 3d at 64 n.2; *see also Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996).  Applying this rule, the Special Master has calculated prejudgment interest at the average annual prime rate in each year from the date of the attack (November 19, 2015).  Dkt. 32 at 29–30.  The Court adopts

the Special Master's methodology and her recommended totals here, as it has done in prior cases using this same approach.  *See Fritz*, 324 F. Supp. 3d at 64 n.2.

There is, perhaps, a closer question as to whether the Court should apply its punitive-damages multiplier before or after incorporating prejudgment interest into Plaintiffs' awards.  On the one hand, punitive damages "serve to punish and deter the actions for which they are awarded," *Valore*, 700 F. Supp. 2d at 87—that is, such damages turn on defendants' conduct, rather than plaintiffs' compensation—while "the purpose of [prejudgment interest] is to compensate the plaintiff for any delay in payment resulting from the litigation," *Oldham*, 127 F.3d at 54.  Applying this logic, at least one decision from this Court has concluded that "prejudgment interest does not apply to punitive damages because prejudgment interest is an element of complete compensation and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quotation marks omitted).  But that conclusion rested in part on the view that "nonpecuniary damages, such as solatium damages, do not typically require prejudgment interest because they are designed to be fully compensatory," *id.*, a position this Court rejected in *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d at 64.

This difference of opinion looms large here, because "[p]rejudgment  interest is an element of *complete compensation*." *West Virginia*, 479 U.S. at 310 (emphasis added).  And the Court has already concluded that an award of pain and suffering or solatium "is best viewed as fixed at the time of the loss," *Fritz*, 324 F. Supp. 3d at 64, meaning that prejudgment interest is necessary to "compensate[] for the time value of money and thus is often necessary for full compensation," *Oldham*, 127 F.3d at 54.  Because, in the Court's view, prejudgment interest is necessary to provide complete recompense for at least some of Plaintiffs' compensatory

13

damages, and because "the *total* compensatory damages already awarded" provides the basis for

Plaintiffs' punitive damages, *Hamen*, 407 F. Supp. 3d at 10 (emphasis added), the better

approach is to apply the punitive-damages multiplier *after* completing this calculation.  Most

importantly, by proceeding in this manner, the Court can ensure that the punitive-damage

multiplier applies to the entire compensatory loss, and that the happenstance of when judgment is

entered does not have a material effect on the ultimate value of the judgment.[2]

## CONCLUSION

The Court will enter a separate order awarding damages to Plaintiffs as described above.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date: May 18, 2022

---

[2] In this respect, the Court notes that Federal law provides that post-judgment interest "shall be allowed on any money judgment in a civil case recovered in federal court," 28 U.S.C. § 1961(a), and courts have long held that "the plain language of the statute authorizes post-judgment interest on punitive damages, which are a part of the 'money judgment,'" *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992); *see also Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077, 1080–81 (9th Cir. 2009) (calculating post-judgment interest for punitive damages award).  Given the availability of post-judgment interest on punitive damages awards, including prejudgment interest in the multiplicand (at least to the extent that the time value of money is not otherwise captured by, for example, discounting future losses to their present value) will ensure that equally situated plaintiffs who receive their judgments at different times will receive roughly the same overall monetary relief.